## UNITED STATES v. ROSSINI.
### Civil Action No. 2934.

District Court, E. D. New York.

Nov. 9, 1943.

817

Harold M. Kennedy, U. S. Atty., of Brooklyn, N. Y. (Morris K. Siegel, Asst. U. S. Atty., of Brooklyn, N.Y., of counsel), for plaintiff.

Louis J. Castellano, of Brooklyn, N. Y., for defendant.

CAMPBELL, District Judge.

This is an action brought by the plaintiff on September 29, 1942, to revoke and set aside the order of this Court, dated December 13, 1938, admitting the defendant to citizenship on Petition No. 249,678, and cancelling the Certificate of Naturalization No. 4301247, issued to Vincenzo Rossini, the defendant, on the ground that such order and certificate were procured fraudulently and illegally.

Plaintiff's counsel, in his brief, contends that when the defendant took his oath in open Court, in connection with his naturalization, and swore that he absolutely and entirely abjured and renounced all allegiance to the King of Italy, of whom he was then a subject, and when he also swore that he would support and defend the Constitution and Laws of the United States of America against all enemies foreign and domestic and would bear true faith and allegiance to the same, he did so with a mental reservation and for the purpose of evasion, and thus obtained naturalization by fraud.

Plaintiff's counsel, in his brief, further contends that defendant's naturalization also was illegally procured, because, for a period of five years immediately preceding the date of his application for naturalization, he was not attached to the principles of the Constitution of the United States

and well disposed to the good order and happiness of the United States.

The questions thus presented are, has the plaintiff shown, as required by law:

1. That the defendant did not at the time he took his oath of renunciation and allegiance in open Court in connection with his naturalization take such oath freely, without any mental reservation or purpose of evasion.

2. That the defendant was not at the time of his application for citizenship, and for a period of five years immediately prior thereto, attached to the principles of the Constitution and well disposed to the good order and happiness of the United States.

These contentions are somewhat more limited than the charges made in the complaint herein in which plaintiff charges that the defendant at the time of the filing of his Petition for Citizenship, and at the time he was admitted, and at the time of the taking of his oath:

"He was not attached to the principles of the Constitution of the United States nor was he well disposed toward the good order and happiness of the United States."

"He did not intend to renounce or abjure all allegiance to the King of Italy, Victor Emanuel III."

"He took the oath of allegiance with a mental reservation which nullified the oath."

"At the time he took the oath of allegiance he did not intend to support and defend the Constitution and Laws of the United States against all enemies."

"At the time he took the oath he did not intend to bear true faith and allegiance to the United States and to the Constitution and Laws thereof."

"Since being admitted to citizenship he has not supported and defended the Constitution and Laws of the United States against all enemies and has not borne true faith and allegiance to the United States and the Constitution and Laws thereof."

The complaint also contains a general allegation that the Certificate of Naturalization was procured by the said defendant fraudulently and illegally for the purpose of obtaining the rights and privileges of protection of American citizenship without intending to assume the duties thereof, and that such Certificate of Naturalization is subject to cancellation.

The evidence offered covered a broad field, and I have allowed considerable latitude in order to arrive at an establishment of the truth.

Of course, evidence has been received as to the acts and statements by the defendant subsequent to his naturalization, but the order and certificate could not be set aside in this action because of such acts and statements, but because by such acts and statements evidence might be furnished of what the defendant had in his mind at the time of his naturalization and within the five year period immediately preceding his naturalization.

The defendant was born in Brindisi, Italy, on October 25, 1900. He attended grammar school, technical high school, the Nautical Institute in Italy, and the Royal Italian Naval Academy of Leghorn, and was licensed as a Merchant Marine Officer by Italy. From the date of his graduation in 1922 until 1929, he followed his career as a Merchant Marine Officer, as a result of which he was a member of the Fascist Party, and obtained the rank of Second Officer. In 1922 the defendant was given the rank of War Ship Reserve Officer. The defendant arrived in this County on March 2, 1933, and has since that time remained continuously in the United States, and maintained a home at Brooklyn, New York, where he lives with his wife and two minor children, and all of them are citizens of the United States of America.

From 1933 until April 11, 1943, the defendant was employed by the Italian language newspaper "Il Corriere d'America" published by Mr. Generoso Pope, and for the past seven or eight years he was employed in the capacity of social and labor editor.

His top salary was $45 per week, and he at times also acted as a reporter.

On October 10, 1935, the defendant organized, and had incorporated, the National United Italian Associations, Inc., which has been known, and to which I will hereinafter refer, as the N. U. I. A.

Since its incorporation the defendant has been the Chairman and directing force of that organization N.U.I.A., which consisted of more than one hundred fraternal and social clubs and educational centers.

The Statute in force at the time of defendant's admission to citizenship authorizing cancellation, in so far as it is necessary for consideration, at this time, reads as follows: "It shall be the duty of the United States district attorneys for the respective districts, or the Commissioner or Deputy

Commissioner of Naturalization, upon affidavits showing good cause therefor, to institute proceedings in any court having jurisdiction to naturalize aliens in the judicial district in which the naturalized citizen may reside at the time of bringing the suit, for the purpose of setting aside and canceling the certificate of citizenship on the ground of fraud or on the ground that such certificate of citizenship was illegally procured * * *." Act June 29, 1906, § 15, 34 Stat. 601, as amended, Title 8, § 405, U.S.C.A.

And the existing law, in so far as this case is concerned, is substantially the same. Title 8, Section 738, U.S.C.A.

■ Two causes of action are set up by the Statute: One, for fraud; and, the other, for illegal procurement by failure to meet statutory requirements. These are separate and distinct causes of action, the requirements of proof differing in each cause of action.

Neither time nor space will permit of a review of each portion of the evidence, but all of it has been considered by me.

It consists of statements and articles published in the press, particularly in "Il Corriere d'America", and statements and articles attributed to the defendant as author, editor or controller of the bulletin of the National United Italian Associations, Inc., which appeared in that paper, the activities of the defendant as the organizer, incorporator, and head of that organization, attendance at meetings of the constituent organizations, and the actions and speeches of defendant, and others, at such meetings, the teachings at the schools of such organizations, the visit of the defendant, Mr. Lupis and Mr. Umberto Gualtieri, to Governor Poletti, the claim that defendant misled the men of importance whom he made honorary members of the N.U.I.A., that defendant was a member of the Fascist Party before leaving Italy, that defendant became a member of the Fascist Party when he joined the National Fascist Newspaper Guild of Rome, that defendant took a part in the reception to General Balbo, and that defendant was acquainted with the men listed, considerable in number, and all of whom were Fascists.

Let us not lose sight of the fact that we are not engaged in determining whether or not citizenship should be granted to the defendant, where our inquiry could be very wide, but we are engaged in determining whether the solemn granting of citizenship should be set aside, and the certificate cancelled, where our inquiry is limited.

It is not my opinion as to what the finding should have been on the hearing for admission, but whether on all the evidence such finding could legally have been made.

■ That the defendant was a member of the Fascist Party in Italy, while he was acquiring his education, and that while connected with an Italian language newspaper in this Country he became a member of the Fascist Party when he joined the National Fascist Newspaper Guild of Rome, a Fascist organization, from which he resigned in 1937, because he found it of no use, do not impress me as playing any important part in this matter. It is common knowledge that defendant could not have received his education, or acted as an officer of an Italian merchant vessel, unless he was a member of the Fascist Party, the only party then allowed to exist in Italy, and such membership was of necessity, and not of mature deliberation.

Membership in a press organization of Italy, in whose language the paper to which defendant was attached was printed, strikes me as a purely business arrangement, and nothing more.

The statements and articles printed in "Il Corriere d'America", which were not written by defendant, do not bind him.

Defendant was the organizer of the National United Italian Associations, Inc., and its presiding officer, and in every sense the head of that organization, which I will hereinafter describe as N.U.I.A., a frequent speaker in its behalf, and a frequent attendant at banquets and meetings as its representative.

This organization was made up of a large number of independently formed societies and centers, in the formation and naming of which the defendant had no part. The internal policy and control of these societies and centers rested with their members, and was not controlled by defendant. The N.U.I.A. sought to combine all organized Italians in America in one national organization, for the accomplishment of certain designated purposes, among which were the following:

"1. To unify the Italian associations in America and to coordinate and federate all activities of Italian groups such as Lodges, Clubs, Community and Civic Centers, Fraternal and Benevolent Societies, Athletic and Educational Clubs, etc. that operate in the United States in order that their in-

dividual objects, scopes and aims may be eventually realized and put into practice with the cooperation of the federated Associations.

"2. To coordinate and federate the activities of Italian Associates in America not along political and religious lines but along social and cultural lines.

"3. To undertake and execute concerted and united welfare efforts in order to provide and care for those members of the individual associations who may need moral, cultural or material assistance.

"4. To establish, maintain and operate Community Centers for the purpose of aiding, encouraging and educating the members of the Federated Associations and their families into an appreciation and understanding of the spirit of the American Constitution, and its meaning in the protection of life, liberty and the pursuit of happiness; to further prepare them for the process of naturalization to the end that they may acquire citizenship in the United States and to be inculpated with a sound knowledge of their civic duties and rights with the object of making them good, active and intelligent citizens with a clear understanding of the fundamental laws upon which the American Government and institutions are based.

"5. To encourage and keep alive the spirit of unity and concord among Italian immigrants and to maintain among them high moral, intellectual and cultural ideals to the end that they may contribute to the betterment of the country of their adoption.

"6. To represent Federated Associations in any sphere of action having for its object the benefit of the Italian community in America.

"7. To establish and operate clubs, societies and associations for the "Young" in order that they may spend their leisure and recreational hours in healthful sports, cultural development and the study of their mother tongue.

"8. To establish and operate clubs, societies and associations for "Laborers" in order that their recreational hours may be spent in healthful sports, social affairs, schools of naturalization and in the assimilation of an understanding, knowledge and respect of American culture; and in their assistance for the obtaining of work and the procurement of the passage of laws for their protection in general.

"9. To establish and operate clubs, societies and associations for "Professionals" as an educational body from which may be drawn teachers to assist the clubs and associations of the "Young" and "Laborers".

"10. To promote the interests and elevate the standards of integrity, honor and good fellowship among the members and member Associations, and to bring about a proper understanding among them of the significance and usefulness of the duties discharged by them in fraternal, benevolent, athletic, cultural and civic work.

"11. To collect, correlate, study and disseminate accurate and useful information regarding the Associations in general.

"12. To encourage and offer facilities for the arbitration and/or conciliation of disputes and differences among members of a federated association, and between those associations composing the Federation.

"13. To establish, maintain and operate branch groups under the direction and supervision of the National United Italian Associations, Inc. as well as adherent groups.

"14. To hold, own, lease or manage real estate or other property necessary to effectuate the above aims and purposes.

"15. To do all the things proper, necessary or incidental to the carrying out of the above aims and purposes."

These purposes were in no sense inimical to the interest of the United States.

The defendant, as president and the real controller of that organization, did on several enumerated occasions withdraw the charter of membership of certain of the societies, because he believed that they were not operating in accordance with, and for the accomplishment of, the announced purposes of the N. U. I. A.

The defendant, although not the author, caused the song of that organization to be written.

Defendant was engaged as Social and Labor Editor, and also on occasions as a reporter on the "Il Corriere d'America", but he did not control its editorial policy.

It was a Pro-Fascist paper.

Of course, the question of the form of Government of Italy had a special appeal to those of Italian birth, and possibly of Italian descent, living in the United States, because of pride of race, and of the land from whence they came, even though they

might be Citizens of the United States of America, and with this interest in the subject we can make no objection, provided it did not in any way interfere with the loyalty of such Citizens to this Country, even against Italy, if her interests should run counter to those of the United States of America. We can not, it seems to me, escape the conviction that the N. U. I. A. was Pro-Fascist, as was also the defendant, and that he made speeches in favor of Fascism, but that was for Fascism in Italy.

The merits of Fascism, or Anti-Fascism for Italy, were freely discussed at the time, the Italian language newspapers, and the people of Italian birth, or descent, living in the Country, dividing on that subject, but there is not one word of evidence in this case that the defendant or the N. U. I. A. ever desired to, or much less attempted to, introduce Fascism into the United States of America.

There was no uniforming, except in the case of some individuals, on special occasions, no organizing in military formations, drilling, maintaining of camps for instruction in military matters, and any attempt to link the N. U. I. A. to the German Bund must fail.

The case of United States of America v. Haas et al., D.C.N.D.N.Y., 51 F. Supp. 910, September 24, 1943, opinion of Bryant, J., cited on behalf of the Government, is not in point.

The defendant did take part in the reception to General Balbo, but that does not seem to me to have been evidence of lack of loyalty to the United States.

General Balbo was an outstanding personage, of a nation with which we were maintaining friendly diplomatic relation, and with which we had long had friendly relations, and his arrival was under conditions which made his visit especially attractive to Italians, whether they were, or were not, naturalized.

█ The visit of the defendant, Mr. Lupis and Mr. Umberto to Governor Poletti, when certain articles in newspapers with reference to the defendant's activities were presented, which articles I admitted in evidence not as binding on the defendant, which they were not, but simply to show what was complained about, does not convince me that the defendant was disloyal, and it certainly did not convince Governor Poletti that such was the case, as appears from the letter he wrote subsequent to

that meeting, in which he sustained the defendant's character, as a good Citizen.

I see no reason to believe that the defendant was wilfully misleading the outstanding men of America whom he made honorary members of the N. U. I. A.

On all the evidence it seems quite clear that though the N. U. I. A. was a Pro-Fascist organization, and that defendant was a Pro-Fascist as to Italy, the defendant was not on the best of terms with the Italian Consul, and that the Consul desired, and encouraged, the operating of schools more amenable to his will, than those to any degree controlled by the defendant.

Acquaintanceship of the defendant with a large number of Pro-Fascists was also shown.

These are the principal activities of the defendant, which have been called to my attention for consideration in determining his intentions when he took his oath as a citizen.

This brings me to what I consider the most important thing to be considered, to determine whether the defendant when he took his oath of renunciation and allegiance, he took it with a reservation, not to fully renounce his allegiance to the King of Italy, and not to pledge allegiance to the United States of America as against Italy.

█ If such be shown to be the fact, then the taking of the oath of renunciation and allegiance with such reservation would constitute a fraud, warranting the vacation of the order, and the cancellation of the Certificate of Citizenship. Schurmann v. United States, 9 Cir., 264 F. 917, 18 A. L.R. 1182, appeal dismissed 257 U.S. 621, 42 S.Ct. 185, 66 L.Ed. 401; United States v. Kramer, 5 Cir., 262 F. 395; Glaser v. United States, 7 Cir., 289 F. 255; Rowan v. United States, 9 Cir., 18 F.2d 246.

For such a fraud, if such there was, the order granting citizenship and the Certificate of Citizenship should properly be vacated and set aside.

The N. U. I. A. published an official monthly bulletin known as "L'Italiano Nuova" (The New Italian), of which the defendant was the sole editor.

This defendant became a citizen on December 13, 1938.

In the December 31, 1938, issue of "The New Italian", the official monthly bulletin

of the N. U. I. A., of which the defendant was the sole editor, an article entitled "Platonic Love and the Italo-Americans" appeared which in part stated as follows:

" * * * the only person really authorized to pronounce himself concerning this with absolute authority, Benito Mussolini, has long ago unequivocally spoken."

"The love for Italy of Italians in America, who have kept their original citizenship, seems to be entirely platonic, entirely sentimental, desolately abstract, however poetical it may be; whereas the love for Italy of the Italian citizen who has become an American citizen is a love which, losing not a jot of its sentimental attributes, is a love prolific of practical actions and of results."

"Who were the Italians who during the Ethiopian war used their influence so that America should keep strict neutrality and definitively abstain herself from the application of sanctions? Were they Italians with Italian citizenship or Italians with American citizenship? * * * From whom did Representatives and Senators of the United States receive tons of telegrams, in order that they support the cause of strict neutrality, so necessary to Italy, from Italians with Italian citizenship? Certainly not. For, an Italian who has remained Italian even upon the matter of citizenship has no voice whatsoever here; * * *. Only naturalized Americans will be heard. These only are the ones who count * * *."

"Certainly the Duce must have been thinking of this, when he urged Italians in America not to be content of being 'helots', but to participate actively, as actively as possible, to the political and administrative life of the United States; practical as ever, Benito Mussolini thought that if the Italians of America wish to unfold some action of support, they cannot do it except in the guise of and in the capacity of American citizens."

There was also published alongside of and below the article Platonic Love and the Italo-Americans in "The New Italian", and included in the reprint on the back of defendant's letter, the following:

"Remember Theodore Roosevelt

"The Great American President Theodore Roosevelt often repeated: 'No alien can ever become a Good American Citizen if he forswears of Motherland of origin.'

"Our program, therefore, hinges upon the education of mass of Italo-Americans, to make her feel and vibrate in the Italian way to the benefit of Great America. This program is well explained here and upon the new identification card which is ready, from now on, for the New Italian."

The defendant says that he is not responsible for that article, notwithstanding the fact that he was the sole editor of "The New Italian", and read the article before it was published, and that nothing appeared in "The New Italian" unless he approved it, but the defendant surely cannot deny his approval of that article, as he caused it to be reprinted on the back of a letter which he circulated.

That letter invited the recipient to become a member of the N. U. I. A., and, in part, said: "That the Confederation is a non-partisan group constituted legally in the United States for the protection of the Italian-Americans and for the welfare of their children; and also to perpetuate friendly relations between Italy and America." And also said: "That is a fundamental purpose of the confederation to always hold high the prestige of the Italian people by diffusing the history, the language and the glorious Italian traditions throughout this country of adoption."

Naturally, with the use of the name "Mussolini", the average American would at once be prejudiced against the article, and give it the worst interpretation.

However, we must consider what occasioned the letter.

Was it an appeal to Italians to obtain American Citizenship to use it against the United States?

Or, was it an appeal to Italians to obtain American Citizenship, without in any way asking them to be disloyal to their new Country, the United States of America, but, pointing out to them how, while being loyal to the United States, they could still be helpful to Italy, as against another nation. I accept the latter construction.

This article was written shortly after the United States of America had determined to maintain strict neutrality with reference to the Italo-Ethiopian War, and not join in enforcing sanctions.

The agitation for neutrality on the part of the United States had not been solely that of Italians, but by countless Americans, native born or naturalized, of different racial extractions.

One other thing of moment was, when the said Mr. Pope on September 8, 1941, decided to change the policy of his paper

"Il Corriere d'America" from Pro-Fascist to Anti-Fascist, the defendant and some others connected with that paper were not prepared over night to change their opinion, and on October 1, 1941, communicated with the Italian Ambassador, and asked his opinion as to whether they should go along with the changed policy of the paper, or seek other employment where they could continue to support Pro-Fascism.

While this shows a real belief at that time in Pro-Fascism, was that disloyal to the United States of America, or was it confined to a belief in Pro-Fascism for Italy, not for the United States, and was it unnatural to ask the opinion of a representative of a friendly nation as to its support of its form of Government?

Defendant continued with the paper after it became Anti-Fascist.

Having considered what has been offered, as tending to show a construction of the aforesaid article by the defendant, which showed the taking of his oath as a citizen of the United States of America, with a reservation of allegiance to the King of Italy, and thereby obtaining citizenship under fraud; let us look at the actions of the defendant from which the opposite interpretation might be drawn.

The evidence shows that the defendant has never been charged with the commission of any offense, and has at all times behaved as a law-abiding citizen. Defendant has never been connected with any overt, illegal, violent, or unlawful action, or with any disturbance of any sort. Public officials, and other citizens have testified that he has been a law-abiding person who enjoys an excellent reputation, and that they have never heard anyone question his loyalty to the United States of America.

The evidence further shows that upon a temporary visit to the United States, prior to 1933, the defendant attended evening high school and a university. That during his period of service with the newspaper "Il Corriere d'America," the defendant rendered public service of a substantial character, without compensation, to the National, State and City Governments, including a number of speeches over the radio in the Italian language, made at the request of the N. R. A. in 1934, Compensation Insurance Law translations, and instructions, made at the request of the State Department of Labor, and a proposal and plan offered by the defendant and accepted by the City of New York, relating to the delivery of coal and ice by dealers, and the delivery of coal and ice to persons on relief, under which plan the City saved $500,-000 each year during 1935, 1936 and 1937. The evidence further shows that the defendant in addition to the foregoing suggested a resolution for the observance of Bill of Rights Day, put forth his best efforts to have the necessary legislation adopted by Congress, and the Legislature, and the issuance of proclamations by the President and Governor, and others, for the observance of the Bill of Rights Day.

Everything hereinbefore referred to occurred before a state of war existed between the United States of America and Italy, and while I well understand that acts may be committed when we are not at war that will warrant cancellation of citizenship, it does not seem to me that sufficient has been shown. This defendant remained with the paper after it became Anti-Fascist, which was before war was declared.

There is not one word of evidence to show any lack of loyalty by the defendant to the United States of America during the war against Italy, and this, it seems to me, is the supreme test.

■ The burden of proof is upon the Government to prove fraud by a preponderance of the evidence, and that the defendant obtained his naturalization unlawfully. United States v. Rovin, D.C., 12 F.2d 942; United States v. Woerndle, 9 Cir., 288 F. 47; United States v. Ebell, D.C., 44 F. Supp. 43.

■ The Government has not borne the burden of proof that the defendant took the oath of citizenship and renunciation under a mental reservation and for the purpose of evasion.

The Government has not borne its burden of proof that the defendant procured the order granting citizenship and the certificate of citizenship by fraud.

■ The Government has not borne its burden of proof that the defendant illegally procured citizenship by failure to meet statutory requirements, because as to that cause of action the decision of the Supreme Court in Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796, decided June 21, 1943, Mr. Justice Murphy writing for the Court, is controlling authority, and the Government has not

824

borne its burden, and the proof in this case is not of the quality there required.

A decree should be entered in favor of the defendant dismissing the complaint on the merits, but without costs.