UNITED STATES of America,
Plaintiff,

v.

Joe PROFACI, also known as Joseph Pro-
faci and as Giuseppe Profaci,
Defendant.

Civ. 17413.

United States District Court
E. D. New York.

Dec. 9, 1958.

Cornelius W. Wickersham, Jr., U. S. Atty., E. D. New York, Brooklyn, N. Y., for plaintiff, Margaret E. Millus, Asst. U. S. Atty., Brooklyn, Maxwell M. Stern, U. S. Naturalization Examiner, Brooklyn, N. Y., of counsel.

Paige & Paige, New York City, for defendant, Samuel Paige, New York City, of counsel.

BRUCHHAUSEN, District Judge.

This proceeding was instituted by the plaintiff, the Government, to cancel the certificate of naturalization issued to the defendant upon the ground that he obtained it by the fraudulent concealment of his prior criminal record consisting of several arrests, one of which culminated in a conviction on a charge of forgery and sentence thereon to imprisonment for one year. The statute claimed to have been violated is Section 340(a) of the Immigration and Nationality Act of 1952, also cited as 8 U.S.C.A. § 1451 (a).

It developed upon this trial that the defendant was an ex-convict at the time he

gained citizenship in 1927 in that the said forgery conviction and imprisonment had occurred in Sicily six years previously and that the conviction and sentence were affirmed on appeal.

Although questioned by Government agents in 1925, 1927, 1928 and 1953, as to his moral character, it is claimed that he concealed his criminal record.

While some of those occasions were separate and apart from the naturalization proceeding, it has been held that such evidence is relevant as bearing upon the behavior and intent of the applicant. United States v. Rossi, 2 Cir., 182 F.2d 292; United States ex rel. Harrington v. Schlotfeldt, 7 Cir., 136 F.2d 935, certiorari denied Krause v. United States, 327 U.S. 781, 66 S.Ct. 680, 90 L.Ed. 1008.

On the first occasion in 1925, the defendant intimates that he was ignorant of the procedure and relied upon the advice of a friend. His principal excuse for the alleged concealments at other times was that he thought the questioners were inquiring only about arrests in this country.

The Background of the Defendant Prior to 1925, When he was Allegedly First Questioned by A Government Agent in Palermo in Connection With his Application for A Visa to Enable him to Return to the United States.

It appears that the defendant was born in a village near Palermo, Italy, on October 1, 1897; that he left school at the age of thirteen years, was in business with his father for about eleven years; that in 1921 he left the old country for America, accompanied by family friends, Gaetano Mangano and his son, Vincent; that the elder Mangano helped him with the travel documents; that all three of them engaged in a grocery business in Chicago; that in 1923 Gaetano Mangano returned to Italy; that in Chicago in 1924, the defendant executed and filed a notice of intention or declaration to become a citizen, giving his occupation as merchant; that in the spring of 1925, he procured the necessary papers for a visit to his family in Italy, taking with him the duplicate copy of the notice of intention; that the defendant claims that he was then aided by a real estate man whose name he did not recall; that he remained abroad a few months and in May 1925 procured a visa from the American Consul in Palermo, enabling him to return to America.

As to the Defendant's Sworn Statement Before the American Consul in Palermo in 1925 that he had Never Been Arrested.

At the trial the defendant admitted that he affixed his signature to the application for a visa (Exhibit 3) in the American Consul's Office in Palermo in May 1925. Contained therein are the details of the defendant's birth, residences, physical characteristics, names and addresses of parents, statements that the defendant was able to speak and write in Italian and English, that he had "not been in prison" and was not a member of any of the fourteen classes listed therein excluded from admission to the United States under the Immigration Laws, one of which is designated "Criminals." Attached to the application were official certificates from local authorities indicating that no criminal record had been found.

The American Consul, Mr. Edgar Nathan, whose certificate is attached to the application, testified by deposition that the principal work of his office was the consideration of visa applications; that an applicant was required to produce police records showing that he had not been arrested; that the application forms were not issued to the public; that the clerks in his office were instructed to question applicants in the Italian language as to whether they had ever been imprisoned; that no visa was issued to one known to be a convict; that the clerks filled in the applicants' answers and caused the forms to be executed before the Consul or Vice Consul.

The defendant, at this trial, testified that he did not know the contents of the said application signed by him; that he

was accompanied to the Consul's Office by his old friends, the aforementioned Gaetano Mangano, now deceased, and his son, Vincent; that the elder Mangano handed him the application for his signature; that he was neither questioned nor asked to swear to it and did not meet the Consul. Vincent Mangano also so testified.

It is noted that the defendant was then in his 28th year, had been in business for fourteen years and had twice crossed the ocean.

One of the weaknesses in the defense is that the elder Mangano, the defendant's alleged agent on this mission and an old family friend who had helped him to get to America in 1921, was then fully aware of the defendant's conviction and imprisonment for forgery in 1920. In this connection the defendant, on cross-examination at this trial, testified viz.:

"Q. Mr. Mangano appealed it? (i. e. the 1919–1920 arrest and conviction)

"A. And my father.

"The Court: Q. They appealed it for you? You knew it had been appealed?

"A. Yes."

Exhibits 8 and 9, placed in evidence by the Government at this trial, established that the arrest was based on a criminal charge of knowingly using a forged document; that the defendant was convicted thereon, sentenced to one year's imprisonment and that the judgment of conviction was affirmed on appeal.

The second time when the defendant was questioned by a Government agent, as previously mentioned, was in 1927 when he presented his petition for citizenship.

As to The Defendant's Alleged False Answers to Questions of the Naturalization Examiner on June 7, 1927.

After establishing that the Examiner, Robert P. Lesch, died prior to the trial the Government introduced into evidence his handwritten record of the examination (Exhibit 4) together with an interpretation of the symbols therein in use by the officials showing that the defendant denied he had a criminal record. Following is an extract of material portions of that record together with the meanings of the symbols, viz.:

"Date filed Jun 7, 1927
"Petitioner Joe Profaci
"Business Grocer
"R E (meaning applicant could read English)
"N Y S May 1926 (meaning that applicant stated he resided in New York since May 1926)
"Bkn. Sept. 4/21 to Dec. 1921
"Chicago Dec. 1921 to May 14, 1926
"Bkn. Since May 14, 1926
"Age 29 Single S R E (meaning applicant speaks and reads English)
"No C R (meaning that applicant testified that he had no criminal record)
"Visited mother in Italy March 1925 to June 1925."

The Government's experts testified that it was the usual practice of every examiner to privately question each applicant as to whether he had ever been arrested or convicted of a crime and to indicate a negative reply by the symbol "N C R" or "No C R".

General Order No. 16 (Exhibit 5) issued by the Bureau to all examiners covering that period provided, in part, as follows:

"In questioning the applicant, the Examiner, after establishing the fact that he has complied with the jurisdictional requirements of law, will satisfy himself whether he is mentally and morally qualified for citizenship and is attached to the principles of the Constitution. * * *

"Where the petitioner is asked whether he has ever been arrested or charged with a violation of any law or ordinance, his response should be specifically noted in writing by the

Examiner as a part of the record of the examination."

The defendant and his witness, Mr. Massolo, testified that they were questioned in the presence of each other and that the defendant was asked whether he had ever been arrested in this country rather than, as claimed by the examiner, whether he had ever been arrested.

The third occasion when the defendant was questioned by a Government agent was in Cleveland in 1928, about a year subsequent to the date of his certificate of citizenship.

As to the Defendant's Alleged False Answers When Arrested in Cleveland in December, 1928.

The defendant when cross examined at this trial admitted that he was questioned in Cleveland on December 5, 1928, by an Immigration Inspector and denied that he had ever been arrested. He testified as follows:

"Q. Do you recall being asked how many times have you ever been arrested and answering, 'Never before, this is the first time?' A. You talk about 1928?

"Q. December 5, 1928 in Cleveland before an Immigration inspector. A. Yes, I was. They pick me up, arrest, whatever you call it.

"Q. You recall him asking you that and you answered, 'Never before, this is the first time.' A. Well, I don't recall. I recall asking the question.

"The Court: What do you recall they asked you about?

"The Witness: They asked me if I have any conviction in New York or any conviction in other—conviction. I said no.

"By Miss Millus: Q. They didn't ask you the question, 'Have you ever been arrested?' A. Yes. I say, 'No.'

"Q. Is that all you said? A. I say, 'No.'

"Q. Nothing else? A. No, I say, 'No.'" (Tr. 362–363).

The Government then offered in evidence the statement of the defendant before the Immigration Inspector in Cleveland on that date, taken down by a stenographer.

After a colloquy with counsel as to its admissibility, the trial record continued, as follows:

"The Court: I am saying that you said in Cleveland in 1928 you had never been arrested, is that right?

"The Witness: Never was arrested.

"The Court: Never was arrested.

"By Miss Millus: Q. That is what you told them in Cleveland, that you were never arrested?

"A. I meant in Brooklyn. They don't ask me—."

It should be noted that at the point where the defendant believed he would be confronted with the stenographic record, he conceded making the unqualified denial that he had ever been arrested.

As to the Defendant's Answers When Questioned on April 3, 1953 and thereafter.

The plaintiff's witness, John T. Seeley, an Immigration Inspector, testified that on April 3, 1953, he questioned the defendant as to whether the naturalization examiner had asked him if he ever was arrested; that the defendant told Seeley that he thinks that question was asked and that his reply was no and that his reason for so answering was that he misunderstood the examiner and thought he meant whether the arrest was in the United States.

The plaintiff's witness, Detective Joseph T. Corrigan, testified that on June 6, 1958, he and a fellow officer served the defendant with a Senate subpoena; that the defendant informed them that right after World War I he purchased a horse for his father's business and that a short time later he was taken to jail and held for a year.

The Defendant's Testimony at the Trial that the Examiner in 1927 asked him whether he was ever arrested in this country, rather than whether he was ever arrested, obviously is a Concocted Story.

█ The credible evidence is that the defendant concealed his criminal record from the authorities for more than twenty-five years and only divulged it when he could no longer challenge the inevitable.

A summary of the defendant's concealment is as follows:

On May 16, 1925, some four years after his arrest, conviction and imprisonment on a charge of forgery, he signed an application for a visa in the United States Consul's Office denying that he had ever been arrested.

On June 7, 1927, he appeared before a Naturalization Examiner and made a similar denial.

On December 5, 1928, in Cleveland, according to the defendant's testimony at this trial, he testified before an immigration inspector that he had never been arrested. He admits that he gave that answer, without qualification, although he thought the questioner meant whether he was arrested in Brooklyn, a mental reservation on the part of Profaci.

On April 3, 1953, he was questioned by another immigration official, John T. Seeley. The latter testified at this trial that the defendant admitted that in June 1927 the naturalization examiner asked him whether he had ever been arrested and that he replied in the negative and gave his reason that he thought the examiner referred to arrests in the United States. Here again we have a mental reservation of the defendant. Even then he refrained from divulging the forgery conviction and imprisonment but he did for the first time admit the arrests, stating that the 1919 arrest was the result of purchasing a horse or horses.

As late as January 7, 1958, the defendant filed his answer herein wherein he denied that he had been convicted in Italy on a forgery charge and sentenced to imprisonment for one year.

However, the defendant, at the trial, when confronted with the authentic proof of the conviction, submitted in evidence by the Government, could no longer remain reticent on this subject and was obliged to concede it.

The defendant's contention that the examiner's question was limited to arrests in the United States is plainly a last desperate effort to escape the consequences of his fraud.

The Defendant's Concealment of his criminal record enabled him to secure Citizenship through fraud.

█ Citizenship is not automatically granted. A primary test of eligibility is the morality of the applicant. Without adequate information as to past behavior, the authorities were deprived of the principal means of assessing the applicant's character. The practice, as established by the Government and followed in this case, was to inquire about arrests. If arrests are divulged, an investigation of the circumstances ensues. The defendant's false answer deterred such investigation which if made would have disclosed the defendant's criminal record.

As to the Questions of
Law affecting this case.

The Nationality Act of 1940 provided for two separate causes of action for revocation of citizenship, namely, illegal procurement and fraud, each requiring different proof. United States v. Rossini, D.C., 52 F.Supp. 816. Illegal procurement existed where through an error of law or fact the court granted a certificate lacking compliance with statutory requirements. 3 C.J.S. Aliens § 153; United States v. Ginsberg, 243 U.S. 472, 37 S.Ct. 422, 61 L.Ed. 853.

Illegal procurement as a ground of revocation was eliminated in the 1952 Nationality Act which prescribed fraud as a sole ground. United States v. Stromberg, 5 Cir., 227 F.2d 903.

██ Fraud connotes perjury, falsification, concealment and misrepresenta-

tion. Knauer v. United States, 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500, and United States v. Genovese, 3 Cir., 236 F. 2d 757. To constitute a violation of the statute the fraud must be concerned with a material fact. False answers given by an applicant for citizenship are material if they deprived the Government of the opportunity of investigating his moral character. The inquiry is not limited to a five year period. Corrado v. United States, 6 Cir., 227 F.2d 780; Stacher v. United States, 9 Cir., 258 F.2d 112 and United States v. Albertini, 9 Cir., 206 F. 133; Stevens v. United States, 7 Cir., 190 F.2d 880.

While proof that the concealment related to a crime involving moral turpitude is essential in exclusion and deportation cases there is no such requirement in denaturalization cases. Brenci v. United States, 1 Cir., 175 F.2d 90.

The relief sought by the plaintiff is granted. Submit proposed findings and decree.