## UNITED STATES v. HAAS et al.

District Court, N. D. New York.

Sept. 24, 1943.

Irving J. Higbee, U. S. Atty., of Syracuse, N. Y. (B. Fitch Tompkins, Asst. U. S. Atty., of Syracuse, N. Y., and Robert M. Hitchcock, Chief Atty., Criminal Division, Department of Justice, of Washington, D. C., of counsel), for the Government.

Richard Collins, of Syracuse, N. Y., for defendants Haas, Fuchs, Simon and Zeiler.

Joseph Petrunick, of Syracuse, N. Y., for defendant Rossler.

BRYANT, District Judge.

Each of these five suits, consolidated for the purpose of trial, was instituted, pursuant to the provisions of Sec. 738, 8 U.S. C.A., to vacate the orders admitting the defendants to citizenship and to vacate and cancel the certificates of naturalization issued pursuant to such orders, on the

ground that the same were fraudulently obtained.

The factual issue before the court is the state of mind of each defendant at the time he took his oath of allegiance. Did each of the defendants, when taking his oath, unreservedly and unqualifiedly renounce and abjure allegiance and fidelity to the German Reich or did he take the oath with mental reservations?

Naturalization is a privilege, not a right. It can lawfully be granted only upon strict compliance with the conditions contained in the Statute, Sec. 701 et seq., 8 U.S.C.A. No immigrant need apply for citizenship. If he does apply and receives the "precious and priceless gratuity" he must unreservedly assume and bear the obligations and duties of that status. One of the obligations which he must assume is undivided loyalty. His oath of renunciation and future allegiance must be made without mental reservation either conscious or latent. Unless this be a fact it must be said that fraud was practiced in the procuring of the certificate of naturalization.

The Government bases its right to the judgments sought upon the grounds that defendants' membership, leadership, activities and belief in the principles of the German-American Bund, coupled with other acts, clearly show that defendants did not wholly foreswear allegiance to their native land and that the oaths of allegiance were taken with the thought of a divided loyalty.

The evidence in this case may be divided into two parts. The first part is the proof showing the history, objects, purposes, activities, etc., of the German-American Bund. The summary of this part of the evidence is set forth in United States v. Kuhn et al., D.C., 49 Supp. 407, so clearly that to detail it here would be repetitious. The proof well justifies a finding that the aims, purposes and practices of the Bund were un-American and subversive. In fact the defendants do not make any issue over such a conclusion. They impliedly, at least, admit that the facts known in 1943 prove that the Bund was a subversive organization, but they do not admit knowledge of the facts prior to that time. Their contention is that they did not know the true undisclosed purposes of the Bund at time of joining or during the period of their membership; that they believed they could be members of the Bund and, at the same time, be loyal American citizens;

that their understanding of the purposes and aims of the organization was the furtherance of friendly relations between their native and their adopted lands and, through social intercourse and contact, could help maintain and preserve the best of German music, arts, culture, folklore, etc.

The so-called second part of the trial consists of the evidence bearing upon defendants' knowledge of the aims and purposes of the Bund, their acceptance of its principles, their participation in and advocacy of its aims and purposes, and also evidence of other acts and statements which the Government contends bears directly upon their state of mind at time of taking the oath of renunciation and allegiance.

The rule that defendants' acts and statements, made subsequent to their naturalization, are admissible is so well established that citation of authorities is unnecessary. Earlier attitude is generally reflected by later conduct. Later words and acts may show such a lack of Americanism or such an adherence to a foreign Government as to lead irresistibly to the conclusion that there was not a complete breaking of allegiance with the Mother Country.

I agree with Judge Bright (Kuhn case) that mere membership in the Bund would be insufficient to base a revocation of citizenship. However, if a person joined and participated in the activities of the Bund with knowledge of its aims and purposes, and worked toward the fulfillment of those aims and purposes, then the membership well might demonstrate a strong enough adherence to the German Reich to prove nonexistence of full allegiance at the time of taking the oath.

In the critical years of 1938, 1939, 1940 and 1941 there was an increasing likelihood of an ultimate conflict between Nazi Germany and democratic America. The ideologies of the two countries were opposite. The political philosophy of the two governments was absolutely inconsistent one with the other. No person could be attached to both forms of Government. If attached to the principles of one he could not be a loyal adherent of the other. And in the very midst of this period of tenseness, these defendants voluntarily joined the Bund and became participants in its activities. The thought that they were

joining one of the social societies composed of foreign born and descendants of foreign born which have materially aided in furthering better understanding between countries is disproved by the evidence. In fact the evidence shows contra. Defendant Haas was the first leader of the Syracuse Unit of the Bund. He was appointed by Wilhelm Kunze, then Organizational Director and later National Bund Fuehrer. Just prior to the formation of the Unit, Kunze, at a meeting in Syracuse, explained some of the aims and purposes of the Bund. Haas, at the time of acceptance of leadership, understood that one of its purposes was the formation of a National Socialist Party in the United States to be patterned after the Nazi Party in Germany. He testified that he learned this from Kunze and that he tried to explain to the members the aims of the Bund as set forth by Kunze. Without his explanation, the commands issued and the literature supplied to the members coupled with the setup and workings of the Unit, as disclosed by the evidence, must have appraised defendants that their activities were planned for the sole purpose of helping the German Reich.

In October, 1938, a large delegation from the members of the Syracuse American Legion broke up a Bund meeting. This is the meeting that was referred to in the evidence as the "riot meeting". No approval of the Legionaires' acts can be given. Their motives did not justify their manner of action. Nonetheless their acts brought home to these defendants and the other Bund members a sharp warning that the Syracuse public believed the Bund un-American in its aims, purposes and activities. How these defendants reacted to that warning has a material bearing on the issues. Their subsequent acts must be set forth in considerable detail in the findings. Sufficient here to summarize briefly.

Haas lost his job immediately after the "riot meeting". He then went to New York to ascertain if the Bund would guarantee him employment. One of the other defendants accompanied him. Not receiving such a guarantee, he resigned as leader and ostensibly severed his connection with the Bund. His so-called severance was for public consumption only. Later, on several occasions, he attended meetings held in private homes and made donations to the Bund. Secretly he adhered to the Bund.

After the riot meeting, defendants agreed among themselves and with other members that thereafter Bund meetings would be held in private homes and without publicity. They were so held until after the raid on Pearl Harbor. The formality, or ritualistic work, of earlier meetings was abandoned. During parts of this period defendants Fuchs, Rossler and Simon acted as leaders. At the meetings Bund commands were read or distributed. Bund literature, much of a propaganda nature, was received and distributed. During a part of this period the Syracuse Unit had an O.D., a Women's Division and a D.K.V. affiliate. No records were kept and letters, commands, etc., were destroyed soon after receipt. Bund Headquarters recorded the members by numbers instead of by name. The members paid dues and contributions were sent regularly to the National Bund. Through letters and personal visits the defendants—with the possible exception of Haas—were in freqeunt contact with the leaders of the National Bund. At least two of the defendants, Fuchs and Simon, in October, 1940, read Bund Command No. 37. The part of this command referring to the Selective Training and Service Act of 1940, 50 U.S.C.A. Appendix § 301 et seq., reads:

"We represent the standpoint however, that an induction into military service is NOT justified, inasfar as it concerns Bund members and American-Germans for in the Selective Service law the citizenship rights of Bund members and the defenders of Germandom are unconstitutionally severed.

"Every man, if he can, will refuse to do military duty until this law and all other laws of the country or the States which confine the citizenship rights of Bund members are revoked.

"We will fight to establish a precedent in this servile matter."

This command clearly shows that the Bund, because of allegiance to the German Reich, advocated noncompliance with our laws and a refusal to bear arms. These two defendants, with that knowledge before them, continued until about December 10, 1941, to be members of the organization. This subversive command in no way affected their loyalty for or participation in the activities of the Bund.

According to the testimony of defendant Rossler he severed his connection with the

Bund in January, 1940. His reasons were that he learned, when he attended the National Convention in early September, 1939, that the Bund was much larger and of a more military aspect than he had thought. From what he saw and heard he had a suspicion that the leaders might, without his knowledge, do some unpatriotic act and he be blamed for it. He thought it safer to be out. A fact worth noting is that he, after reaching those conclusions, continued as leader for about four months and, during that period, received and read or distributed Bund commands to the members, paid dues and made contributions, on his own behalf and on behalf of other members, to the various funds of the Bund one of which was the "Fighting Fund". This fund was used to hire lawyers and pay expenses incurred in defending the Bund and its members against attack. He never made any mention of his suspicions to his friends of the Syracuse Unit. His claimed severance seems to have been ostensible rather than real. At the time he claims to have quit he made a donation to the Unit. This indicates adherence to the purposes of the Bund. In May, 1941, there was a Bund meeting at the home of defendant Zeiler at which Bundes Fuehrer Kunze and National Secretary Luedtke were present. Rossler was at that gathering. According to his testimony he happened to call on Zeiler just as the meeting was over.

In 1942 the F. B. I. investigated the then defunct Syracuse Unit of the Bund. Everyone, including the defendants, knew that these trained investigators were working to protect America against sabotage and Fifth Column activities. They had the right to expect wholehearted co-operation from every American citizen. In the course of their investigation these defendants were questioned. Each defendant, with the possible exception of Haas, repeatedly and deliberately lied about the functioning of the Syracuse Bund, their connection with it, etc. They followed a course of action agreed upon among themselves and other members of the Unit. They blocked the investigation in so far as they were able. Haas cannot be excepted from the falsifying charge. He denied any connection with, and all knowledge of, the Bund after the "riot meeting". The evidence refutes his denial. He was not co-operative. At times feigned ignorance and

forgetfulness are as misleading as falsely spoken words.

Witnesses were called and testified to conversations had with the individual defendants. The minimum that can be found from the testimony is that defendants were admirers of Nazi ideologies and governmental philosophy and were reluctant to aid in the destruction or limitation of the same.

Prior to these defendants' applications for naturalization Hitler had either gained power or had stated the principles upon which he was seeking power. In either event the principles of the National Socialist German Labor Party were principles that had to be abjured wholly before these defendants could unreservedly swear allegiance to the Constitution and laws of the United States. Continued belief in the leadership principles, the inviolacy of German citizenship, racial superiority and racial discrimination and persecution would show an antagonistic state of mind. These defendants, with knowledge of an aroused public opposition, embraced the first opportunity to join, and actively participate in, an organization which not only espoused those beliefs but had as one of its purposes the placing of Germany's interests first. Their acts and words lead to the conclusion that they did not make a full and complete severance with their Mother country. Without such a severance it must be said the certificates of naturalization were fraudulently procured. This conclusion is not weakened through Government failure to show overt acts. Subversive activities are not necessary elements of the charge. Persons, who are both law abiding and of good moral character, may by words and conduct demonstrate such a lack of undivided loyalty that it must be said full allegiance did not exist at the time of the application for citizenship.

This decision is not in conflict with Schneiderman v. United States, 63 S.Ct. 1333, 87 L.Ed. ——, decided June 21, 1943. The issues are different. Here the issue is legal fraud. In the Schneiderman case the issue seems to have been illegal procurement in the absence of fraud.

Motions to dismiss, upon which decisions were reserved, are denied. Objections to receipt of depositions, rulings upon which were reserved, are overruled.

Plaintiff is entitled to judgment.