## KNAUER v. UNITED STATES.

No. 510. Argued March 28, 29, 1946.—Decided June 10, 1946.

*Ode L. Rankin* argued the cause and filed a brief for petitioner.

*Frederick Bernays Wiener* argued the cause for the United States. With him on the brief were *Solicitor General McGrath, Robert S. Erdahl* and *Beatrice Rosenberg.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Knauer is a native of Germany. He arrived in this country in 1925 at the age of 30. He had served in the German army during World War I and was decorated. He had studied law and economics in Germany. He settled in Milwaukee, Wisconsin, and conducted an insurance business there. He filed his declaration of intention to become a citizen in 1929 and his petition for naturalization in 1936. He took his oath of allegiance and was admitted to citizenship on April 13, 1937. In 1943 the United States instituted proceedings under § 338 (a) of the Nationality Act of 1940, 54 Stat. 1137, 1158, 8 U. S. C. § 738 (a), to cancel his certificate of naturalization [1] on the ground that it had been secured by fraud in that (1) he had falsely and fraudulently represented in his petition that he was attached to the principles of the Constitution and (2) he had taken a false oath of allegiance. The District Court was satisfied beyond a reasonable doubt that Knauer practiced fraud when he obtained his certificate of naturalization. It found that he had not been and is not attached to the principles of the Constitution and that he took a false oath of allegiance. It accordingly

---

[1] Sec. 338 (a) of the Nationality Act of 1940 provides:

"It shall be the duty of the United States district attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court specified in subsection (a) of section 301 in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground of fraud or on the ground that such order and certificate of naturalization were illegally procured."

entered an order cancelling his certificate and revoking the order admitting him to citizenship. The Circuit Court of Appeals affirmed. 149 F. 2d 519. The case is here on a petition for a writ of certiorari which we granted to examine that ruling in light of our decisions in *Schneiderman* v. *United States,* 320 U. S. 118, and *Baumgartner* v. *United States,* 322 U. S. 665.

I. In the oath of allegiance which Knauer took, he swore that he would "absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty, and particularly to the German Reich," that he would "support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic"; that he would "bear true faith and allegiance to the same" and that he took "this obligation freely without any mental reservation or purpose of evasion." [2] The first and crucial issue in the case is whether Knauer swore falsely and committed a fraud when he promised under oath to forswear allegiance to the German Reich and to transfer his allegiance to this nation. Fraud connotes perjury, falsification, concealment, misrepresentation. When denaturalization is sought on this (*Baumgartner* v. *United States, supra*) as well as on other grounds (*Schneiderman* v. *United States, supra*), the standard of proof required is strict. We do not accept even concurrent findings of two lower courts as conclusive. *Baumgartner* v. *United States, supra,* pp. 670–671. We reexamine the facts to determine whether the United States has carried its burden of proving by "clear, unequivocal, and convincing" evidence, which does not leave "the issue in doubt," that the citizen

---

[2] Since 1795 an alien seeking admission to citizenship in this country has been required to swear that he renounced allegiance to all foreign powers, including his native land. 1 Stat. 103, 414; 2 Stat. 153, 154; R. S. 2165; 34 Stat. 596, 598; 54 Stat. 1137, 1157.

who is sought to be restored to the status of an alien obtained his naturalization certificate illegally. *Schneiderman* v. *United States, supra,* p. 158.

That strict test is necessary for several reasons. Citizenship obtained through naturalization is not a second-class citizenship. It has been said that citizenship carries with it all of the rights and prerogatives of citizenship obtained by birth in this country "save that of eligibility to the Presidency." *Luria* v. *United States,* 231 U. S. 9, 22. There are other exceptions of a limited character.[3] But it is plain that citizenship obtained through naturalization carries with it the privilege of full participation in the affairs of our society, including the right to speak freely, to criticize officials and administrators, and to promote changes in our laws including the very Charter of our Government. Great tolerance and caution are necessary lest good faith exercise of the rights of citizenship be turned against the naturalized citizen and be used to deprive him of the cherished status. Ill-tempered expressions, extreme views, even the promotion of ideas which run counter to our American ideals, are not to be given disloyal connotations in absence of solid, convincing evidence that that is their significance. Any other course would run counter to our traditions and make denaturalization proceedings the ready instrument for political persecutions. As stated in *Schneiderman* v. *United States, supra,* p. 159, "Were the law otherwise, valuable rights would rest upon a slender reed, and the security of the status of our naturalized citizens might depend in

---

[3] Thus a naturalized citizen must wait seven years before he is eligible to sit in the House (Article I, § 2) and nine years before he can enter the Senate. Article I, § 3. Furthermore, a naturalized citizen may lose his American citizenship by residing abroad for stated periods. §§ 404–406. Nationality Act of 1940, 54 Stat. 1137, 1170, 8 U. S. C. §§ 804–806. See *Perkins* v. *Elg,* 307 U. S. 325, 329.

considerable degree upon the political temper of majority thought and the stresses of the times."

These are extremely serious problems. They involve not only fundamental principles of our political system designed for the protection of minorities and majorities alike. They also involve tremendously high stakes for the individual. For denaturalization, like deportation, may result in the loss "of all that makes life worth living." *Ng Fung Ho* v. *White*, 259 U. S. 276, 284. Hence, where the fate of a human being is at stake, we must not leave the presence of his evil purpose to conjecture. Cf. *Bridges* v. *Wixon*, 326 U. S. 135, 149. Furthermore, we are dealing in cases of this kind with questions of intent. Here it is whether Knauer swore falsely on April 13, 1937. Intent is a subjective state, illusory and difficult to establish in absence of voluntary confession. What may appear objectively to be false may still fall short of establishing an intentional misrepresentation which is necessary in order to prove that the oath was perjurious. And as *Baumgartner* v. *United States, supra,* indicates, utterances made in years subsequent to the oath are not readily to be charged against the state of mind existing when the oath was administered. 322 U. S. p. 675. Troubled times and the emotions of the hour may elicit expressions of sympathy for old acquaintances and relatives across the waters. "Forswearing past political allegiance without reservation and full assumption of the obligations of American citizenship are not at all inconsistent with cultural feelings imbedded in childhood and youth." *Baumgartner* v. *United States, supra,* p. 674. Human ties are not easily broken. Old social or cultural loyalties may still exist, though basic allegiance is transferred here. The fundamental question is whether the new citizen still takes his orders from, or owes his allegiance to, a foreign chancellory. Far more is required to establish that fact

than a showing that social and cultural ties remain. And even political utterances, which might be some evidence of a false oath if they clustered around the date of naturalization, are more and more unreliable as evidence of the perjurious falsity of the oath the further they are removed from the date of naturalization.

We have read with care the voluminous record in this case. We have considered the evidence which antedates Knauer's naturalization (April 13, 1937), the evidence which clusters around that date, and that which follows it. We have considered Knauer's versions of the various episodes and the versions advanced by the several witnesses for the United States. We have considered the testimony and other evidence offered by each in corroboration or impeachment of the other's case. We have considered the appraisal of the veracity of the witnesses by the judge who saw and heard them and have given it that "due regard" required by the Rules of Civil Procedure. Rule 52 (a). We conclude with the District Court and the Circuit Court of Appeals that there is solid, convincing evidence that Knauer before the date of his naturalization, at that time, and subsequently was a thoroughgoing Nazi and a faithful follower of Adolph Hitler. The conclusion is irresistible, therefore, that when he forswore allegiance to the German Reich he swore falsely. The character of the evidence, the veracity of the witnesses against Knauer as determined by the District Court, the corroboration of challenged evidence presented by the Government, the consistent pattern of Knauer's conduct before and after naturalization convince us that the two lower courts were correct in their conclusions. The standard of proof, not satisfied in either the *Schneiderman* or *Baumgartner* cases, is therefore plainly met here.

We will review briefly what we, as well as the two lower courts, accept as the true version of the facts.

As early as 1931, Knauer told a newly arrived immigrant who came from the same town in Germany that in his opinion the aim of Hitler and the Nazi party was good, that it would progress, and that it was necessary to have the same party in this country because of the Jews and the Communists. During the same period, he told another friend repeatedly that he was opposed to any republican form of government and that Jewish capital was to blame for Germany's downfall. He visited Germany for about six months in 1934 and while there read Hitler's Mein Kampf. On his return he said with pride that he had met Hitler, and that he had been offered a post with the German government at 600 marks per month, that Hitler was the savior of Germany, that Hitler was solving the unemployment problem while this country was suffering from Jewish capitalism, that the Hitler youth organization was an excellent influence on the children of Germany. On occasions in 1936 and 1937 he was explosive in his criticism of those who protested against the practices and policies of Hitler.

The German Winter Relief Fund was an official agency of the German government for which German consulates solicited money in the United States. In the winter of 1934–1935 Knauer was active in obtaining contributions to the Fund and forwarded the money collected to the German consulate in Chicago.

The German-American Bund had a branch in Milwaukee. Its leader was George Froboese—midwestern gauleiter and later national leader. The Bund taught and advocated the Nazi philosophy—the leadership principle, racial superiority of the Germans, the principle of the totalitarian state, Pan-Germanism and of Lebensraum (living space). It looked forward to the day when the Nazi form of government would supplant our form of government. It emphasized that allegiance and devotion to Hitler were superior to any obligation to the United

States.[4] Knauer denied that he was a member of the Bund. But the District Court found to the contrary[5] on evidence which is solid and convincing.

Knauer participated in Bund meetings in 1936. In the summer of 1936 he and his family had a tent at the Bund camps. In the fall of 1936 he enrolled his young daughter in the Youth Movement of the Bund—a group organized to instill the Nazi ideology in the minds of children of German blood. They wore uniforms, used the Nazi salute, and were taught songs of allegiance to Hitler. Knauer attended meetings of this group.

The Federation of German-American Societies represented numerous affiliated organizations consisting of Americans of German descent and sought to coordinate their work. It was the policy of the Bund to infiltrate older German societies. This effort was made as respects

---

[4] A number of denaturalization cases in the District Court raised the question as to the nature of the Bund. All of them were consolidated for trial on that single issue, including Knauer's case. At the conclusion of the consolidated trial on that issue, Knauer's case was separately tried. But the findings as to the nature of the Bund were made on the basis of evidence in the consolidated trial. The consolidation of the cases was challenged and upheld in the Circuit Court of Appeals. 149 F. 2d p. 520. No such error is alleged here.

These findings by the District Court as to the nature of the Bund are likewise not challenged here. For similar findings respecting the nature of the Bund see *United States* v. *Schuchhardt,* 49 F. Supp. 567, 569; *United States* v. *Ritzen,* 50 F. Supp. 301, 302; *United States* v. *Haas,* 51 F. Supp. 910, 911; *United States* v. *Wolter,* 53 F. Supp. 417, 418–425; *United States* v. *Sautter,* 54 F. Supp. 22; *United States* v. *Holtz,* 54 F. Supp. 63, 66–70; *United States* v. *Baecker,* 55 F. Supp. 403, 404–408; *United States* v. *Bregler,* 55 F. Supp. 837, 839–840; *United States* v. *Wilmovski,* 56 F. Supp. 63, 64; *United States* v. *Claassen,* 56 F. Supp. 71, 72.

[5] "I find as a fact that the defendant was a member of the Milwaukee unit of the Bund; that he was so considered by its officers and members; that most of his interests and activities were in behalf of the Bund; and that, though completely aware of its aims and purposes, he deliberately vigorously promoted the objects of the Bund."

the Federation.  Knauer assisted Froboese and others between 1933 and 1936 in endeavoring to have the swastika displayed at celebrations of the Federation.  In 1935 Knauer reprimanded a delegate to the Federation for passing out pamphlets opposing the Nazi government in Germany.  At a meeting of the Federation in 1935, Knauer moved to have the Federation recognize the swastika as the flag of the German Reich.  The motion failed to carry.  In 1936 the swastika flag was raised at a German Day celebration without approval of the Federation.  A commotion ensued in which Bundists in uniform participated, as a result of which the swastika flag was torn down.  At the next meeting of the Federation, Knauer proposed a vote indicating approval of the showing of the swastika flag.  The motion failed and a vote of censure of the chairman was passed.  The chairman resigned.  Thereupon Froboese and others proposed the formation of the German-American Citizens Alliance to compete with the Federation.  It was organized early in 1937.  The constitution and articles of incorporation of the Alliance provided that all of its assets on dissolution were to become the property of a German government agency for the dissemination of propaganda in foreign countries—the Deusches Auslands-Institut.  The Alliance was a front organization for the Bund.  It was designed to bring into its ranks persons who were sympathetic with the objectives of the Bund but who did not wish to be known as Bund members.

On February 22, 1937—less than two months before Knauer took his oath of naturalization—he was admitted to membership in the Alliance and became a member of its executive committee.  His first action as a member was to volunteer the collection of newspaper articles that attacked the Alliance, Germany, and German-Americans.  In 1937 and in the ensuing years, Knauer wrote many letters and telegrams to those who criticized the Bund

or the German government. In 1938 Knauer was elected vice-president of the Alliance and subsequently presided over most of its meetings. He was the dominant figure in the Alliance. In May 1937 the German consul presented to the Alliance the swastika flag which had been torn down at the Federation celebration the year before. Not long after his naturalization Knauer urged that the Alliance sponsor a solstice ceremony, a solemn rite at which a wooden swastika is burned to symbolize the unity of German people everywhere. In August 1937 the Alliance refused to participate in an affair sponsored by a group which would not fly the swastika flag. In May 1938 Knauer at a meeting of the Alliance read a leaflet entitled "America, the Garbage Can of the World." In 1939 he arranged for public showings of films distributed by an official German propaganda agency and depicting the glories of Nazism.[6]

There was an intimate cooperation between the Alliance and the Bund. The Bund camp was used for Alliance affairs and it was available to Alliance members. The Alliance supported various Bund programs. It supported the Youth Group of the Bund and the Bund's solstice celebration. In 1939 the Youth Group of the Bund held a benefit performance for the Alliance. In 1940 it ad-

---

[6] In 1937 he said to one witness, an American of German ancestry, "Now, isn't that wonderful what Hitler did over there? Don't you like it? When the American Government would take the same line, then it goes in Germany like Hitler did, that will be fine."

Before and after his naturalization he continuously preached the Nazi concept of racial unity among those of German blood. In 1937 he addressed members of the Alliance on the subject of the German volk, saying "With the rise and fall of the German nation, we rise and fall."

In 1940 he said in conversation with another witness, in reply to the witness' remark that he was an American citizen, "I am a German-American." When told that there was no hyphen in the word, he

mitted the Youth Group of the Bund at the request of Froboese. Knauer consistently defended the Bund when it was criticized, when it was denied the use of a park or a hall, when its members were arrested or charged with offenses. In spite of the fact that Knauer knew the real aims and purposes of the Bund and was aware of its connection and Froboese's connection with the German government, he consistently came to its defense. Thus when a Wisconsin judge freed disturbers of a Bund meeting, he wrote the judge saying that the judge's remarks against the Bund were a "slander of a patriotic American organization." He subscribed to the official Bund newspaper and to a propaganda magazine issued and circulated by an agency of the German government. He held shares in the holding company of the Bund camp which was started in 1939. A photograph taken at the dedication of the new Bund camp in 1939 shows Knauer among a group of prominent Bund leaders with arm upraised in the Nazi salute. He owned a cottage at the Bund camp. He used the Nazi salute at the beginning and end of his speeches and at the Bund meetings.

In May 1938 Knauer and Froboese formed the American Protective League with a secret list of members. Knauer was elected a director. A constitution and by-

---

replied, "I lean toward and favor the Germans." When asked if he would fight for America if the Germans invaded this country, he refused to answer, saying, "I am a German-American."

In 1941 the Wisconsin Federation of German-American Societies pledged itself to uphold the Constitution of the United States, to maintain the democratic form of government, and to fight the totalitarian form of government and everything it stood for. Knauer issued an appeal to German-Americans, stating that that declaration constituted open warfare against the then German government and was a plan to create discord among Germans and to induce those in Germany to revolt against the German Reich.

laws were adopted and copies mailed by Knauer and Froboese to Hitler. One Buerk was a German agent operating in this country and later indicted for failing to register as such. In 1939 the German consulate in Chicago supervised the recruiting of skilled workers in that region for return to Germany for work in German industries. The German consul, Buerk, Froboese and Knauer conducted the recruiting. Knauer participated actively in interviewing candidates. At intervals farewell parties were given by Knauer and Froboese to the returning workers and their families.

Important evidence implicating Knauer in promoting the cause of Hitler in this country was given by a Mrs. Merton. She testified that, prompted solely by patriotic motives, she entered the employ of Froboese in 1938 in order to obtain evidence against the Bund and its members. The truth of her testimony was vigorously denied by Knauer. But the District Court believed her version, as did the Circuit Court of Appeals. And we are persuaded on a close reading of the record not only that her testimony was strongly corroborated but also that Knauer's attempts to discredit her testimony do not ring true.[7]

Her testimony may be summarized as follows: She acted as secretary to Froboese in 1938. During the period of her employ Froboese and Knauer worked closely to-

---

[7] The people whom Mrs. Merton at the time of her work for Froboese told of her mission corroborated her. One of them on occasion took her to the Froboese home and saw her enter. At the time of the trial Froboese was dead. Mrs. Froboese denied that Mrs. Merton had ever worked for Froboese or that she had ever seen her. The testimony of another witness, however, related a conversation with Mrs. Froboese in which she said that a Mrs. Merton had worked for Froboese. Knauer persistently denied that he ever saw or knew Mrs. Merton. But Mrs. Merton's husband and a neighbor identified Knauer as the man who called on Mrs. Merton at her home one day.

gether on Bund matters. He helped Froboese in the preparation of articles for the Bund newspaper, of speeches, and of Bund correspondence. He helped Froboese prepare resolutions to be offered at the 1938 Bund convention calling for a white-gentile-ruled America. When Froboese left the city to attend the convention, he told her to contact Knauer for advice concerning Bund matters. Letters signed by Froboese and Knauer jointly were sent to Hitler and other Nazi officials. One contained a list of 700 German nationals. One was the constitution and by-laws of the American Protective League which we have already mentioned. One to Hess said they had to lay low for awhile, that there was an investigation on. A birthday greeting to Hitler from Froboese and Knauer closed with the phrase, "In blind obedience we follow you." Knauer told her never to reveal that the Alliance and the Bund were linked together. One day she asked Knauer what the Bund was. His reply was that the Bund "was the Fuehrer's grip on American democracy." She reminded Knauer that he was an American citizen. He replied, "That is a good thing to hide behind."

We have given merely the highlights of the evidence. Much corroborative detail could be added. But what we have related presents the gist of the case against Knauer. If isolated parts of the evidence against Knauer were separately considered, they might well carry different inferences. His alertness to rise to the defense of Germans or of Americans of German descent could well reflect, if standing as isolated instances, attempts to protect a minority against what he deemed oppressive practices. Social and cultural ties might be complete and adequate explanations. Even utterances of a political nature which reflected tolerance or approval of the Nazi program in Germany might carry no sinister connotation, if they were considered by themselves. For many native-borns in this country did not awaken to the full implications of the

Nazi program until war came to us. And as we stated in *Schneiderman* v. *United States, supra,* p. 139: "Whatever attitude we may individually hold toward persons and organizations that believe in or advocate extensive changes in our existing order, it should be our desire and concern at all times to uphold the right of free discussion and free thinking to which we as a people claim primary attachment."

But we have here much more than political utterances, much more than a crusade for the protection of minorities. This record portrays a program of action to further Hitler's cause in this nation—a program of infiltration which conforms to the pattern adopted by the Nazis in country after country. The ties with the German Reich were too intimate, the pattern of conduct too consistent, the overt acts too plain for us to conclude that Knauer was merely exercising his right of free speech either to spread tolerance in this country or to advocate changes here.

Moreover, the case against Knauer is not constructed solely from his activities subsequent to April 13, 1937— the date of his naturalization. The evidence prior to his naturalization, that which clusters around that date, and that which follows in the next few years is completely consistent. It conforms to the same pattern. We do not have to guess whether subsequent to naturalization he had a change of heart and threw himself wholeheartedly into a new cause. We have clear, convincing, and solid evidence that at all relevant times he was a thoroughgoing Nazi bent on sponsoring Hitler's cause here. And this case, unlike the *Baumgartner* case, is not complicated by the fact that when the alien took his oath Hitler was not in power. On April 13, 1937, Hitler was in full command. The evidence is most convincing that at that time, as well as later, Knauer's loyalty ran to him, not to this country.

The District Court properly ruled that membership in the Bund was not in itself sufficient to prove fraud which would warrant revocation of a decree of naturalization. Otherwise, guilt would rest on implication, contrary to the rule of the *Schneiderman* and *Baumgartner* cases. But we have here much more than that. We have a clear course of conduct, of which membership in the Bund was a manifestation, designed to promote the Nazi cause in this country. This is not a case of an underling caught up in the enthusiasm of a movement, driven by ties of blood and old associations to extreme attitudes, and perhaps unaware of the conflict of allegiance implicit in his actions. Knauer is an astute person. He is a leader— the dominating figure in the cause he sponsored, a leading voice in the councils of the Bund, the spokesman in the program for systematic agitation of Nazi views. His activities portray a shrewd, calculating, and vigilant promotion of an alien cause. The conclusion seems to us plain that when Knauer forswore allegiance to Hitler and the German Reich he swore falsely.[8]

---

[8] The following finding of the District Court is a fair conclusion from this record:

"The attachment of the defendant Knauer in the year 1931 to the aims and objects of Hitler's National Socialist movement, his allegiance and attachment to the Third Reich as manifested by his statements and his frequent use of the Nazi salute in public, his devotion to and promotion of the display of the swastika flag and ceremonies using it in symbolic pledge of fidelity to the Reich, his fierce concern over the good name and honor of the German race, his bitter and acrimonious denunciation of everything which interfered with or stood in the way of the fortunes of the German Reich, his belief in and advocacy of the German racial concept of duty and obligation of all Germans to the fatherland regardless of citizenship, his belief in and attachment to the principles and concepts of National Socialism, his espousal of the aims and objects of the German-American Bund and his active participation therein for the promotion of its aims and objects, his promotion and domination of the German-American Citizens Alliance to further the aims and objects of the Bund, his uninterrupted effort by word and deed to polit-

II. It is said, however, that the issue of fraud may not be tried in this case. An analogy is sought to be drawn to those cases where relief against a prior judgment, on the ground that perjured testimony was introduced at the trial, was denied. *United States* v. *Throckmorton,* 98 U. S. 61, 66. And see *Toledo Scale Co.* v. *Computing Scale Co.,* 261 U. S. 399, 421. But that rule goes no further than to say that the issue of fraud can become *res judicata* in the judgment sought to be set aside. We need not consider the extent to which a decree of naturalization may constitute a final determination of issues of fact, the establishment of which Congress has made conditions precedent to naturalization.⁹ Those facts relate

ically activate our German-American people in the interests of the German Reich, his persistent efforts among German-Americans, by means of charitable programs, speeches and movie films, to revive in them a feeling of fidelity and loyalty to the German Reich, the assistance he rendered to the consular representatives of the Reich in the attainment of matters advancing German interests, his fervent devotion and blind attachment to the Fuehrer at a time when the German Reich was hostile to the United States, his lack of affection for or devotion to the United States, his cynical evaluation of his own American citizenship, as well as the evidence in its entirety, can be interpreted only as establishing, and I so find, that the defendant at the time he filed his petition for naturalization did not in good faith intend to renounce absolutely and forever all allegiance and fidelity to the German Reich, and at the time of his naturalization and at all times thereafter the defendant did not in fact renounce and abjure all allegiance and fidelity to the German Reich, but intended to retain and did retain allegiance and fidelity to the German government."

⁹ At the time of Knauer's naturalization the Act provided:

"No alien shall be admitted to citizenship unless (1) immediately preceding the date of his petition the alien has resided continuously within the United States for at least five years and within the county▪where the petitioner resided at the time of filing his petition for at least six months, (2) he has resided continuously within the United States from the date of his petition up to the time of his admission to citizenship, and (3) during all the periods referred to in this subdivision he has behaved as a person of good moral character, attached to the principles of the Constitution of the United States, and well

to the past—to behavior and conduct. But the oath is in a different category. It relates to a state of mind and is a promise of future conduct. It is the final act by which an alien acquires the status of citizen. It requires forswearing of allegiance in good faith and with no mental reservations. The oath being the final step, no evidence is heard at that time. It comes after the matters in issue have been resolved in favor of the applicant for citizenship. Hence, no opportunity exists for the examiner or the judge to determine if what the new citizen swore was true, was in fact false. Hence, the issue of fraud in the oath cannot become *res judicata* in the decree sought to be set aside. For fraud in the oath was not in issue in the proceedings and neither was adjudicated nor could have been adjudicated.

Moreover, when an alien takes the oath with reservations or does not in good faith forswear loyalty and allegiance to the old country, the decree of naturalization is obtained by deceit. The proceeding itself is then founded on fraud. A fraud is perpetrated on the naturalization court. We have recently considered the broad powers of equity to set aside a decree for fraud practiced on the court which granted it. *Hazel-Atlas Co.* v. *Hartford Co.,* 322 U. S. 238. The present suit is an equity suit. *Luria* v. *United States, supra,* pp. 27–28. But we need not consider in this case what the historic powers of equity might be in this situation. For Congress has provided that fraud is a basis for cancellation of certificates of natural-

disposed to the good order and happiness of the United States. At the hearing of the petition, residence in the county where the petitioner resides at the time of filing his petition, and the other qualifications required by this subdivision during such residence, shall be proved by the oral testimony of at least two credible witnesses, citizens of the United States, in addition to the affidavits required by this Act to be included in the petition." § 6 (b) of the Act of March 2, 1929, 45 Stat. 1512, 1513–1514 which replaced § 4, subdivision Fourth, a similar provision of the Act of June 29, 1906, 34 Stat. 596, 598.

ization in proceedings instituted by the United States.[10] The legislative history of that enactment shows that false swearing was one of the evils included in the statutory grounds for denaturalization.[11]  That power was granted

[10] By § 15 of the Act of June 29, 1906, 34 Stat. 601, it was provided:

"That it shall be the duty of the United States district attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any court having jurisdiction to naturalize aliens in the judicial district in which the naturalized citizen may reside at the time of bringing the suit, for the purpose of setting aside and canceling the certificate of citizenship on the ground of fraud or on the ground that such certificate of citizenship was illegally procured. . . ."

It was held in *United States* v. *Ness*, 245 U. S. 319, 325, that this statutory power to cancel certificates of naturalization is broader than that afforded in equity, independently of statute, to set aside judgments.

[11] H. Rep. No. 1789, 59th Cong., 1st Sess., p. 2:

"The conditions that have been revealed by special investigations of the frauds committed against the naturalization laws render wholly unnecessary any argument upon the necessity at this time of fully exercising all the authority in naturalization matters conferred by the Constitution upon Congress."

.        .        .        .        .

"The worst and most glaring frauds have consisted in perjury, false impersonation, and the sale and use of false and counterfeit certificates of naturalization."

As stated by a sponsor of the measure on the floor of the House:

"The boon of American citizenship must not be cheapened by lax and unconventional methods of courts and public officers who administer the law, but once granted it should endure for all time.  It is conferred by the Federal Constitution and by laws authorized by the Constitution.  When citizenship is once legally granted, of course it can not be invalidated, and it ought not to be, but no one questions that it is within the power of the Government to provide for the cancellation of certificates of citizens that have been fraudulently obtained.  A certificate tainted with fraud is in the sense of the law no certificate at all." 40 Cong. Rec. p. 7040.

The Court noted in *United States* v. *Ness*, 245 U. S. 319, 324, that "widespread frauds in naturalization," including "the prevalence of perjured testimony in cases of this character," led to the passage of this legislation.

to give added protection against fraud committed on the naturalization courts. *United States* v. *Ness,* 245 U. S. 319, 324, 327. Cancellation of a certificate on the grounds of fraud includes cancellation for falsely swearing that the applicant forswore allegiance to his native country. Though the making of a false oath be called intrinsic fraud (see *United States* v. *Throckmorton, supra*), it is within the reach of the statute.

We have no doubt of the power of Congress to provide for denaturalization on the ground of fraud. The Constitution grants Congress power "To establish an uniform Rule of Naturalization . . ." Article I, § 8. The power of denaturalization comes from that provision and the "necessary and proper" Clause in Article I, § 8. See *Tutun* v. *United States,* 270 U. S. 568, 578. We do not have here a case where, after an alien has been naturalized, Congress provides new grounds which are invoked for cancellation of his certificate. Fraud—the basis of revocation with which we are now concerned—was a statutory ground for denaturalization when Knauer took his oath. Moreover, we are not faced with the question of what limits there may be to conditions for denaturalization which Congress may provide. A certificate obtained by fraud is clearly within the reach of congressional power. As stated in *Johannessen* v. *United States,* 225 U. S. 227, 241: "An alien has no moral nor constitutional right to retain the privileges of citizenship if, by false evidence or the like, an imposition has been practiced upon the court, without which the certificate of citizenship could not and would not have been issued." And see *Luria* v. *United States, supra,* pp. 23–24; *United States* v. *Ness, supra,* p. 327. To hold otherwise would be an anomaly. It would in effect mean that where a person through concealment, misrepresentation or deceit perpetrated a fraud on the naturalization court, the United States would be

remediless to correct the wrong.   That would indeed put a premium on the successful perpetration of frauds against the nation.   We cannot conclude that Congress, which may withhold the right of naturalization (*Tutun* v. *United States, supra,* p. 578), is so powerless.   We adhere to the prior rulings of this Court that Congress may provide for the cancellation of certificates of naturalization on the ground of fraud in their procurement and thus protect the courts and the nation against practices of aliens who by deceitful methods obtain the cherished status of citizenship here, the better to serve a foreign master.

Since fraud in the oath of allegiance which Knauer took is sufficient to sustain the judgment below, we do not reach the other questions which have been argued.

*Affirmed.*

Mr. Justice Jackson took no part in the consideration or decision of this case.

Mr. Justice Black, concurring.

I am satisfied beyond all reasonable doubt, from the testimony and admissions of the petitioner himself, made in open court, that he had never at any time, either before or after his naturalization, deviated from his wholehearted allegiance to, and constant service of, the German Nazi Government.

I realize, as the dissent in this case emphasizes, the dangers inherent in denaturalizations.   Had this judgment rested on the petitioner's mere philosophical or political beliefs, expressed or unexpressed, I should not concur in its affirmance.   But petitioner's admissions as to his own conduct leave me in no doubt at all that he was, even in obtaining naturalization, serving the German Government with the same fanatical zeal which motivated

the saboteurs sent to the United States to wage war. I am unable to say that Congress is without constitutional power to authorize courts, after fair trials like this one, to cancel citizenship obtained by the methods and for the purposes shown by this record.

MR. JUSTICE RUTLEDGE, dissenting.

For reasons I have suggested elsewhere,[1] but which now are squarely involved, I cannot bring myself to concur in this judgment.

My concern is not for Paul Knauer. The record discloses that he has no conception of, much less attachment to, basic American principles or institutions. He was a thorough-going Nazi, addicted to philosophies altogether hostile to the democratic framework in which we believe and live. Further, he was an active promoter of movements directed to securing acceptance of those ideas here and incorporating them in our institutions. And in this case, by contrast with those of *Schneiderman* and *Baumgartner*,[2] it would be hard to say that the evidence would not sustain a finding that he falsely took the oath of allegiance or that he never in his heart renounced his prime fealty to Adolph Hitler and Nazi Germany. Nor, in my opinion, can it be thought unequal to supporting a conclusion that, from a time prior to his admission to citizenship in 1935 until at any rate the assault on Pearl Harbor, Knauer was in the active service of the Nazi regime, promoting its cause here, and also for a short time in Germany, as the object of his first loyalty.

If therefore in any case a naturalized citizen's right and status can be revoked, by the procedure followed here

---

[1] *Schneiderman* v. *United States,* 320 U. S. 118, concurring opinion at 165.

[2] See note 1; *Baumgartner* v. *United States,* 322 U. S. 665.

or perhaps at all, it would be in such a case as this.   But if one man's citizenship can thus be taken away, so can that of any other.   And even in this case it would be in large part for his political convictions and acts done openly in espousal of them.   Not merely Knauer's rights, but those of millions of naturalized citizens in their status and all that it implies of security and freedom, are affected by what is done in this case.   By the outcome they are made either second-class citizens or citizens having equal rights and equal security with others.

No native-born American's birthright could be stripped from him for such a cause or by such a procedure as has been followed here.   Nor could he be punished with banishment.   To suffer that great loss he must forfeit citizenship by some act of treason or felony and be adjudged guilty by processes of law consistent with all the great protections thrown around such trials.   Not yet has attempt been made to do this otherwise.   Nor in my opinion could it be done, except for some such cause or by any less carefully safeguarded procedure.

In no instance thus far has our system tolerated destruction of that right of the native-born, except by voluntary surrender, on account of convictions held, views expressed, or acts done in promoting their acceptance falling short of treason as defined in the Constitution [3] or conviction for felony.   Nor has it thus far brought about that extinction by forms of trial other than those provided for such offenses.   Moreover, even in such cases, although the penalty may be death or loss of the rights of citizenship, we have not yet imposed those penalties altogether foreign to our institutions, namely, deportation and exile.   For one cause and one only have they been provided, namely, the loss of the naturalized citizen's status.

---

[3] Constitution, Art. III, § 3.   See *Cramer* v. *United States,* 325 U. S. 1.

I do not find warrant in the Constitution for believing that it contemplates two classes of citizens, excepting only for two purposes. One is to provide how citizenship shall be acquired, Const., Art. I, § 8; Amend. XIV, § 1, the other to determine eligibility for the presidency. Const., Art. II, § 1. The latter is the only instance in which the charter expressly excludes the naturalized citizen from any right or privilege the native-born possesses.[4] *Luria* v. *United States,* 231 U. S. 9, 22. I do not think there is any other in which his status is, or can be made, inferior.

Congress, it is true, is empowered to lay down the conditions for admission of foreign-born persons to citizenship. In this respect it has wide authority. But it is not unlimited. Nor is Congress given power to take away citizenship once it is conferred, other than for some sufficient act of forfeiture taking place afterward. Naturalized citizens are no more free to become traitors or criminals than others and may be punished as they are when they commit the same offense. But any process which takes away their citizenship for causes or by procedures not applicable to native-born citizens places them in a separate and an inferior class. That dilemma is inescapable, though it is one not heretofore faced squarely. Unless it is the law that there are two classes of citizens, one superior, the other inferior, the status of no citizen can be annulled for causes or by procedures not applicable to all others.

To say that Congress can disregard this fact and create inequalities of status as between native and foreign-born citizens by attaching conditions to their admission, to be applied retroactively after that event, is only to say in

---

[4] Cf. Constitution, Art. I, § 3; Art. I, § 2, providing respectively that no person shall be a Senator who shall not have been nine years a citizen and, in the case of Representatives, seven years.

other words that Congress by using that method can create different, and inferior, classes of citizens. We have heretofore pointed out why citizens with strings attached to their citizenship, for its revocation, can be neither free nor secure in their status. *Schneiderman* v. *United States,* 320 U. S. 118, and concurring opinion at 165. All that is said there, in that respect, applies here or to any procedure by which citizenship may be annulled. In my opinion the power to naturalize is not the power to denaturalize. The act of admission must be taken as final, for any cause which may have existed at that time. Otherwise there cannot but be two classes of citizens, one free and secure except for acts amounting to forfeiture within our tradition; the other, conditional, timorous and insecure because blanketed with the threat that some act or conduct, not amounting to forfeiture for others, will be taken retroactively to show that some prescribed condition had not been fulfilled and be so adjudged. I do not think such a difference was contemplated when Congress was authorized to provide for naturalization and the terms on which it should be granted.

But if I may be wrong in this, certainly so drastic a penalty as denaturalization, with resulting deportation and exile and all the attendant consequences, should not be imposed by any procedure less protective of the citizen's most fundamental right, comprehending all others, than must be employed to take away the native-born citizen's status or the lesser rights of the foreign-born citizen. If strings may be attached to citizenship and pulled retroactively to annul it, at the least this should be done only by those forms of proceeding most fully surrounded with the constitutional securities for trial which are among the prized incidents of citizenship. It is altogether anomalous that those safeguards are thrown about the foreign-born

citizen when, for some offense, his liberty even for brief periods is at stake, but are withdrawn from him when all that gives substance to that freedom is put in jeopardy.

The right of citizenship is the most precious of all. The penalty of denaturalization is always harsh. Often it is more drastic than any other. It is also unique for this situation. For the required measure of security, the native-born citizen can be deprived of his status only by the rigidly safeguarded trial for treason or for conviction of a criminal offense which brings loss of rights as a citizen. To those procedures, with the same penalties and for the same causes, the foreign-born citizen is subject; but also by them he is protected. He should not be less secure when it is sought to annul his citizenship than when the effort is to bring about its forfeiture. Nor, in either event, should his procedural safeguards be less than when the same consequence, in substance, is inflicted upon the citizen native born.

The procedure prescribed for and followed in this case was not in accord with those standards. I think nothing less is adequate, or consistent with the constitutional status of citizenship, for the purpose of taking it away.

If this means that some or even many disloyal foreign-born citizens cannot be deported, it is better so than to place so many loyal ones in inferior status. And there are other effective methods for dealing with those who are disloyal, just as there are for such citizens by birth.

Accordingly, I would reverse the judgment.

Mr. Justice Murphy joins in this dissent.