**UNITED STATES of America**

v.

**Sam HORWITZ aka Saul Bernard Horwatt.**

**Civ. No. 1009.**

United States District Court
E. D. Virginia, Alexandria Division.
May 8, 1956.

Harlan E. Freeman, Asst. U. S. Atty., Alexandria, Va., for plaintiff.

Joseph A. Fanelli, Joseph H. Freehill, Washington, D. C., and Kabler & Brown, Alexandria, Va., for defendant.

BRYAN, District Judge.

On November 9, 1931, United States citizenship was granted by the Federal district court in New York City to Sam Horwitz.[1] Presently the United States seeks to revoke this conferment of citizenship, charging that it was procured illegally and through the fraudulent concealment of material facts and wilful

1. Under the Act of June 29, 1906, 34 Stat. 596, then 8 U.S.C.A. § 352, as amended.

**840**

misrepresentation. The action is based upon the Nationality Act of 1940 [2] and the Immigration and Nationality Act of 1952.[3]

The illegality, concealment and misrepresentation alleged consist of the following declarations made by the defendant in the course of his naturalization proceedings and now branded false by the United States: that after his arrival in this country he used no names other than Sam Horwitz or Hurwitz; that he had never been arrested or charged with violation of any law; that he fully believed in our form of government; that he had not belonged to, and was not associated with, any organization teaching or advocating the overthrow of the existing government of the United States; that he was not a member of, or affiliated with, any organization teaching disbelief in or opposed to organized government; that he was attached to the principles of Constitution of the United States and well disposed to its good order and happiness; that it was his intention to renounce absolutely and forever all allegiance to any foreign state or sovereignty; that he would support and defend the Constitution and laws of the United States against all enemies; and that he would bear true faith and allegiance to the United States.

The accusations of falsity in respect to the defendant's use of names and his arrest record in the United States were at once refuted. The remaining charges focus into the principal thesis of the Government—that Sam Horwitz immediately prior to, and at the time of, his naturalization was a member and apostle of the Communist Party of the United States. On this proposition hang all the charges now under consideration. As we find no basis for revocation in this case in the absence of fraud, it is unnecessary to distinguish between illegal procurement and fraud and decide whether the 1952 Act preserves a cause of action for denaturalization which had accrued un-

der the 1940 Act on the ground of illegal procurement.

▮ The declarations held untrue by the Government are comprised in the Application for a Certificate of Arrival and Preliminary Form for Petition for Citizenship dated July 22, 1930, in the Petition for Citizenship dated February 24, 1931, and in the naturalization oath November 9, 1931. The defendant unquestionably made the declarations. Despite the testimony of the two experts in the Bridges case, which is now ruled admissible, the court finds that the Communist teachings in 1930 and 1931 did advocate the overthrow of the government of the United States by force and violence. Concededly, the defendant never disclosed any Communist affiliation to the examining officers or the admitting court. Therefore, if he was a member of the Communist Party in 1930 or 1931 his declarations were untrue. But, for the dissolution of the naturalization judgment the evidence must prove not only the untruth of the affirmations— that he was in fact a Communist in the periods covered by the declarations; it must also establish the fraudulence of the declarations, that is, that the declarant knew when he made them that they were falsified by the beliefs he then maintained as a Party member. Moreover, with so dire consequences in the balance, the proof must be made by "clear, unequivocal and convincing evidence which does not leave the issue in doubt", in effect, "proof beyond a reasonable doubt". Schneiderman v. United States, 1943, 320 U.S. 118, 125, 63 S.Ct. 1333, 87 L.Ed. 1796; Baumgartner v. United States, 1944, 322 U.S. 665, 670, 64 S.Ct. 1240, 88 L.Ed. 1525; Knauer v. United States, 1946, 328 U.S. 654, 657, 66 S.Ct. 1304, 90 L.Ed. 1500; Klapprott v. United States, 1949, 335 U.S. 601, 612, 69 S.Ct. 384, 389, 93 L.Ed. 266. We have concluded that the proof fails to meet this prescript.

---

**2.** 54 Stat. 1137, § 338(a), then 8 U.S.C.A. §§ 501, 738(a).

**3.** 66 Stat. 163, § 340, then 8 U.S.C.A. §§ 1101, 1451.

A native of one of the Baltic countries or Russia, Horwitz lawfully entered the United States in 1923, when seventeen years old. Deeply concerned with anti-Semitism, he was attracted by the Communists' protestations against religious discrimination. At twenty-two he joined their Party; it was the fall of 1928. In December 1929 Horwitz was suspended from the Party, his views favoring Jewish nationalism being construed as disloyalty. He further testifies he then severed his connections with the Communists and denies membership in 1930, 1931 or 1932.

To rebut this denial the plaintiff adduces the testimony of a Leonard Patterson and one Thadeus Zygmont. The former was a Communist member from 1928 to 1937. Zygmont joined in 1920 and left the Party in 1938. Patterson identifies Horwitz as attending the Sixth and Seventh Communist Party National Conventions in New York in 1929 and 1930—one of forty New York delegates —and as voting for a resolution favoring "the defeat of 'our own' capitalist government". Patterson says he first met Horwitz at a closed meeting of the Young Communist League in 1928 in New York, participated with him in a needleworkers' strike in 1929, was jailed with him in that connection, and last saw him in November 1933, when Horwitz was engaged in a Communist program. Zygmont states he first met Horwitz in the autumn of 1931 at the Workers' Educational Club, a Communist group, in New York City; that he next saw Horwitz in a Communist section meeting in early 1932 in New York City; and that in April of the same year he encountered the defendant in the offices of the Daily Worker, a Communist publication, preparing for a May day celebration. All of these meetings were closed to non-Communists.

Both of these witnesses were roving agents of the Party, constantly mingling with groups and assemblies of people, and daily dealing with large numbers of persons, collectively and objectively. There was nothing to mark Horwitz among them. Patterson and Zygmont had no special ties with Horwitz and no such intimate association with him, contemporaneously or subsequently, as would imprint his face, his name, or his activities upon their minds. Hence, aside from its impairment by cross-examination but because of the lapse of time alone—nearly a quarter of a century—their recollection of him, when flatly denied by Horwitz, is hardly "evidence which does not leave the issue in doubt". The court cannot find he was a Party member in the critical years, 1930 and 1931.

While Party membership after 1931 is not specifically asserted as ground for recalling his citizenship, evidence in respect to Horwitz' Communist associations immediately after his naturalization was received as relevant in reflecting his mental attitude when he took the oath of citizenship. On March 15, 1932, he appeared before the Committee on Immigration and Naturalization of the House of Representatives. There he denied he was a Communist, but from the printed report his expressions indicate an unwillingness to take arms against the Soviet Union, the symbol of communism. However, they are not so clear and definite as to commit him to that stand, especially when we know his difficulty with the English language and consider his instant testimony on the subject.

Again, in a sworn statement given in 1954 to an investigator of the Immigration and Naturalization Service, Horwitz says he rejoined the Party in "approximately 1932 or '33" and remained a member until 1938. But upon study this statement is not as incriminating as it seems ex facie. During this interval he was an electrician and belonged to "some-sort of a union", but he was unable to obtain admission into a recognized labor union. The great economic depression was then nationwide. He sorely needed employment; he felt that the Communist Party could aid him in procuring entry into a respected union. He joined and headed the sick committee

of the Party. This same statement contains, as well, a complete disavowal of any belief ab initio in the Communist proposal for the forceful overturn of our government. In these circumstances the interview does not, the court believes, reveal him as forswearing himself in 1930 and 1931.

■ But, at all events, decisive of this case is this: that notwithstanding any affiliation of Horwitz with the Communist Party, either before or after his naturalization, the court does not find and feel in the evidence a conviction that Horwitz ever comprehended the reality that one of the Party's aims was the overthrow of the United States government. He never professed or otherwise evinced a knowledge of any such Party tenet. If he did know that violent revolt against this government was a dogma of the Party, the evidence does not establish that he at any time embraced or espoused it. Membership is not in itself enough to fasten upon him knowledge of the Party's objectives. Knauer v. United States, supra, 328 U.S. 654, 669, 66 S.Ct. 1304, 90 L.Ed. 1500. The court is not persuaded that Horwitz ever "compassed or imagined" the overthrow of the United States of America.

His ignorance of the nefarious Communist ambition to depose this Government, though written in the Party creed, is more readily understandable if we consider the contemporary public opinion and Horwitz' own circumstances during his Party affiance of 1928–29. In 1924 Great Britain had recognized the United Soviet Socialist Republics, the embodiment of communism. The United States did likewise in 1933—later, significantly, than Horwitz' oath. Certainly during the span of 1924–33, communism was not generally thought of as so menacing to democratic government as we now know it to be.

In 1924 when Horwitz declared his intention to become a citizen, he was barely eighteen years old and an immigrant of only three months residence. He was but twenty-four when he presented his Application for a Certificate of Arrival and Preliminary Form for a Petition for Citizenship—the most accusing document adduced by the Government. Naturalization was obtained when he was twenty-five. In fairness, the attraction of the Communists for him may well be ascribed to a youthful or undiscriminating revulsion to anti-Semitism, the horrors of which he had witnessed in his native land, and the Party's apparent, however unreal, war against it. Hunt for work could easily account for any association he may have had with the Party in later years. Anyway, the inducement is not proven to have been political.

■ The conclusions of the court are strengthened by the defendant's conduct for the last sixteen years. In that time his behavior is unassailed; from this it is fair to presume that it was correct and proper in every way, for he had put his character in issue. The Government's prayer for revocation and cancellation of the citizenship of Sam Horwitz must be denied. But before closing, it is meet and well to observe that the intimation by Horwitz of unfairness to him on the part of the Immigration Service or by agents of the Federal Bureau of Investigation finds no justification in the record. Both in its preparatory and trial stages this case has been pressed by the representatives of the United States with evident concern both for the public interest and for the rights of the individual.

Adopting this memorandum as its findings of fact and conclusions of law, the court is this day entering an order dismissing the complaint and striking the action from the docket.