Nicholas **DELMORE**, also known as Nicholas Amoruso, Plaintiff,

v.

Herbert **BROWNELL**, Attorney General of the United States and Raymond G. Hoffeller, Agent in Charge of Immigration and Naturalization Service, Defendants.

Civ. A. No. 957–53.

United States District Court
D. New Jersey.
Sept. 30, 1955.

**472**

Anthony A. Calandra, Newark, N. J., for plaintiff. David W. Walters, Miami, Fla., of counsel.

Raymond Del Tufo, Jr., U. S. Atty., by Charles H. Hoens, Jr., Asst. U. S. Atty., Newark, N. J., for defendants.

FORMAN, Chief Judge.

The plaintiff in this suit is Nicholas Delmore, also known as Nicholas Amoruso, a resident of Freehold, Monmouth County, New Jersey, within the jurisdiction of this court. He names as defendants, Honorable Herbert Brownell, Attorney General of the United States, in his capacity as head of the Immigration and Naturalization Service, Department of Justice, an agency of the United States Government, and Raymond G. Hoffeller, as Agent in Charge of the Immigration and Naturalization Office at Newark, New Jersey.

In his complaint the plaintiff alleges, among other things:

that he acquired United States citizenship by virtue of his birth in San Francisco, California, on December 25, 1888 and that as a small child he was taken to Italy by his parents where he remained for several years and then returned to the United States where he has lived continuously for over fifty years;

that for the purpose of clarifying his status, on the advice of an attorney, prior to October 5, 1942, he presented himself to an official of the United States Immigration and Naturalization Service at Philadelphia, Pennsylvania, and requested that an investigation be conducted into his citizenship status and that it be adjudicated, so that he "could conduct himself according to law";

that on October 5, 1942, the Commissioner of Immigration and Naturalization made an "adjudication" that plaintiff was a citizen of the United States, and a copy of such "adjudication" is annexed to the complaint;

that despite the aforesaid "adjudication" on January 27, 1953, a warrant of arrest was issued against plaintiff charging him with being an alien illegally in the United States, based upon his re-entry into the United States at Miami, Florida, on January 2, 1952, after a brief visit to Cuba, and on September 3, 1953, following a hearing, an order was made by a Special Inquiry Officer of the Immigration and Naturalization Service declaring plaintiff to be an alien and that he be deported on the grounds (1) that he illegally entered the United States on or about January 2, 1952 from Cuba and (2) that he so entered the United States without inspection;

that the plaintiff appealed these findings to the Board of Immigration Appeals which affirmed them;

that the findings of the Special Inquiry Officer, affirmed as aforesaid, were based upon improper and incompetent evidence and "unfounded assumptions and procedures" which constitute a denial of due process of law and

that as a result of the action against him a warrant has been issued for the immediate deportation of the plaintiff to Italy and unless restrained the defendants and their agents will deport him to his irreparable injury.

The plaintiff therefore prays for a judgment under the Declaratory Judgments Act, 28 U.S.C.A. § 2201, and the Immigration and Nationality Act, 8 U. S.C.A. § 1503(a),[1] declaring that he is a

---

I.  "(a) If any person who is within the United States claims a right or privilege as a national of the United States and is

denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is

**473**

citizen of the United States and that the defendants be restrained from deporting him and from proceeding with any deportation processes against him pending the final determination of this suit. An order was made granting the prayer for temporary restraint pending the suit.

In their answer the defendants, among other things, deny that the plaintiff acquired United States citizenship by being born in San Francisco, California, and that the Commissioner of Immigration and Naturalization of the United States made an adjudication that he is a citizen of the United States on October 5, 1942. They admit that plaintiff was required to respond in deportation proceedings and that a deportation order has been entered against him based upon the finding that he is an alien.

The case turns on the factual issue of whether the plaintiff left this country and re-entered as an alien in violation of 8 U.S.C.A. § 155(a) [now 8 U.S.C.A. § 1251(a) (2)], or whether he is, as he insists, a United States citizen by birth. Because the issue is framed in terms of plaintiff's status as a United States citizen he is entitled under 8 U.S.C.A. § 1503 to bring this action for a trial *de novo* on that issue free from the burden of overcoming a prior administrative finding. Wong Wing Foo v. McGrath, 9 Cir., 1952, 196 F.2d 120; Mah Ying Og v. McGrath, 1950, 88 U.S.App. D.C. 87, 187 F.2d 199.

Plaintiff, of course, has the burden of proving his citizenship, but he need do this by no more than a preponderance of the evidence. Lee Shew v. Brownell, 9 Cir., 1955, 219 F.2d 301. While plaintiff carries the ordinary burden of proof, once he makes a prima facie case of citizenship the government's rebuttal must be by clear, unequivocal, and convincing evidence. Lehmann v. Acheson, 3 Cir., 1953, 206 F.2d

592, 598–599; Monaco v. Dulles, 2 Cir., 1954, 210 F.2d 760; Rueff v. Brownell, D.C.N.J.1953, 116 F.Supp. 298, 307; Gensheimer v. Dulles, D.C.N.J.1954, 117 F. Supp. 836, 839; Ah Kong v. Dulles, D.C. N.J.1955, 130 F.Supp. 546. It is true that in all but the latter of these cases the government was required to establish by evidence of that quality the expatriation of one who had concededly once been a citizen of the United States. Ah Kong v. Dulles was a suit to establish citizenship as the son of an American father and the same quality of proof was demanded of defendant. Since the heavier burden placed upon the government is in recognition of the preciousness of American citizenship, fundamental fairness requires that it bear that burden in every case where a claim to citizenship is to be torn down. It is the rule where a plaintiff's claim to citizenship is to be disproved by evidence of expatriation (cases cited, supra), and in denaturalization proceedings the government also is required to carry the heavier burden of proof. Knauer v. United States, 1946, 328 U.S. 654, 657, 66 S.Ct. 1304, 90 L.Ed. 1500; Schneiderman v. United States, 1943, 320 U.S. 118, 124–125, 63 S.Ct. 1333, 87 L.Ed. 1796. It follows that the same rule should govern in this case.

Plaintiff claims to have been born in San Francisco, California, on December 25, 1888. The government's case places his birth at Nicosia, in Sicily, Italy, on December 23, 1891. Plaintiff admits spending his childhood in Italy, but asserts that he was taken there by his parents shortly after his birth.

Plaintiff began his presentation of evidence with an attempt to bring himself under the rule that a prior determination of citizenship by the Immigration and Naturalization Service constitutes a prima facie case in a later litigation over the issue:

not a national of the United States, such person may institute an action under the provisions of section 2201 of Title 28 [the Declaratory Judgments Act], against the head of such department **or**

independent agency for a judgment declaring him to be a national of the United States, * * *." 8 U.S.C.A. § 1503 (a).

"If the alien in compliance with his duty to go forward with the evidence presents evidence that the immigration authorities have previously determined that the alien is a citizen of the United States * * the alien establishes a prima facie case which is sufficient to satisfy the statute, in the absence of contrary evidence, and which shifts to the government the duty to go forward with the evidence." Wong Kam Chong v. United States, 9 Cir., 1940, 111 F.2d 707, 710. See also McGrath v. Chung Young, 9 Cir., 1951, 188 F.2d 975, 977.

During World War II, so plaintiff testified, he was asked to produce his birth certificate. He had none and consulted Eugene A. Liotta, a member of the bar of New Jersey, who advised him to travel to California to try to find a record of his birth. Plaintiff made this trip, but it was a fruitless one. Following this Mr. Liotta made inquiry of the Immigration Service and addressed the following letter to it:

"Bureau of Immigration and
   Naturalization
"Franklin Street
"Philadelphia, Pa.
"Gentlemen:

"I beg to advise that I represent one Nicholas Delmore, born at San Francisco, California, on December 25th, 1888, the son of Luigi Amoruso and Providenzia Amoruso. The mother and father of Delmore were born at Necosia, Sicily, Italy. During Delmore's infancy his parents migrated to Italy and took the family with them and within a short time came back to the United States.
"When Delmore arrived at the age of fourteen years he adopted the name of Nicholas Delmore and has never used the name of Nicholas Amoruso since.
"During the war and since it became mandatory for people, who were aliens to register my client, Nicholas Delmore, wanting to be within the law, is uncertain as to whether or not it is necessary for him to register. He wishes to comply with the alien law and would like to have an expression and determination as to whether or not he can be considered a citizen of the United States.
"Most of the information that is in the possession of my client, Delmore, was given to him by his deceased sister. He himself was too young to remember anything that happened during his infancy.
"This letter is sent for the purpose of verifying my discussion with Mr. A. McKay.
"Will you kindly advise me what must be done by my client in order to have his status settled and oblige,
          "Very truly yours,
              /s/ Eugene A. Liotta
                  Eugene A. Liotta"

Testimony was given by Mr. Liotta and the plaintiff that a hearing was held at the Central Office of the Bureau at Philadelphia before an official of the Bureau, and on October 5, 1942, the following letter was sent to Liotta, bearing the signature of Thomas B. Shoemaker, Deputy Commissioner, but actually signed by Argyle R. Mackey, who was a subordinate of Mr. Shoemaker:

"U. S. Department of Justice
"Immigration and Naturalization Service
          "Philadelphia
          "October 5, 1942
"Eugene A. Liotta, Esquire,
"1139 East Jersey Street
"Elizabeth, New Jersey.
"My dear Mr. Liotta:

"Reference is made to your letter of September 28, 1942, concerning the citizenship status of Nicholas Delmore.

"It appears that Mr. Delmore was born at San Francisco, California in 1888, the son of Luigi Amoruso and Providenzia Amoruso; that both his parents were natives and subjects of Italy; and that he was given the name of Nicholas Amoru-

so. It further appears that he was taken to Italy by his parents when a small child; that he returned to the United States when he was 14 years of age, adopted the name of Nicholas Delmore, and that he has remained in this country since.

"You are advised that it is the view of this Service in light of the facts submitted and considered, that Mr. Delmore may properly be regarded a native and citizen of the United States.

"Sincerely yours,

"Earl G. Harrison,
Commissioner

"By /s/ T. B. Shoemaker

"T. B. Shoemaker,
Deputy Commissioner"

The plaintiff testified that the hearing was formal in nature, with transcription of testimony, and contends that the letter of October 5, 1942, was therefore a determination of his United States citizenship.

Mr. Liotta's letter of September 28, 1942, followed up at least a conversation between him and Mr. Argyle R. Mackey, then an Examiner in the Adjudications Branch of the Central Office of the Naturalization and Immigration Service. This is manifest from the paragraph reading:

"This letter is sent for the purpose of verifying my discussion with Mr. A. McKay [sic]."

From various legends appearing in rubber stamps and notations on the letter, as interpreted by the defendants' witnesses during the trial, it may be said the letter went the rounds of the Central Office for the purpose of ascertaining whether there was a record or file with which it could be associated. None appeared. The letter arrived on Tuesday, September 29, 1942. On Wednesday, September 30, there was marked on the letter that there was "No Record" in the Mail and Files Section. On Thursday, October 1, a notation of "no record consolidated" was made. A new number was given the letter for its future identification and then on Monday, October 5, 1942, it was marked "Received" by the Adjudications Branch. On the same day Mr. Mackey signed the reply in his chief's, Mr. T. B. Shoemaker's, name as Deputy Commissioner, and his carbon copy (Defendants' Exhibit 14) bears a stamped notation "Signed and mailed October 5, 1942 Adjudications Branch."

It is altogether probable that no formal hearing occurred, but what was the letter over the signature of the Deputy Commissioner of Immigration and Naturalization, if it was not a decision or determination that the plaintiff could properly regard himself as a "native and citizen of the United States"? It is little wonder that the plaintiff thereafter carried it on his person at all times as he testified.

▇ The plaintiff urged on the one hand, and the defendants denied, on the other, that the contents of the letter of October 5, 1942 expressed the results of an "adjudication" of the citizenship of the plaintiff. But an "adjudication" in the technical sense of the term is not needed in order to establish a prima facie case. Close scrutiny of the above quotation from Wong Kam Chong v. United States will show that only a "determination" by the immigration authorities is necessary in order to accomplish that purpose. "Adjudication" implies formality and a decision based on evidence that has been developed through some form of judicial process. Obviously, the Bureau was not making an "adjudication" "in light of the facts submitted and considered" as the letter of October 5, 1952 says. But "in light of the facts submitted and considered" the Bureau did make a "determination" that plaintiff was a citizen and it is this "determination" that plaintiff may successfully use to establish a prima facie case. Wong Kam Chong v. United States, supra.

Plaintiff did not stop here, however. He introduced testimony in further proof of his United States citizenship.

The remainder of plaintiff's case consists of hearsay statements about his place of birth, which he seeks to bring in under the "pedigree" exception to the hearsay rule. Such declarations have been excluded on the ground that they do not relate directly to "pedigree", Brewster v. Villa, 5 Cir., 1937, 90 F.2d 853; Independence Tp. v. Pompton Tp., Sup.Ct.1827, 9 N.J.L. 209. However, the present trend is to admit them, and to call the rule the "Family History Exception". Lee Hin v. United States, 9 Cir., 1934, 74 F.2d 172; United States v. Wong Gong, 9 Cir., 1934, 70 F.2d 107; Lee Pong Tai v. Acheson, D.C.E.D.Pa. 1952, 104 F.Supp. 503; United States v. Lem You, D.C.S.D.N.Y.1915, 224 F. 519; 5 Wig. § 1501 (1940 ed.); Model Code of Evidence, Rule 524 (1942); Uniform Rules of Evidence, Rules 63(23) and 63 (24) and 63(25) (1953). The Report of the Committee on the Revision of the Law of Evidence to the Supreme Court of New Jersey, issued May 25, 1955, on page 157 et seq. recommends the adoption of the foregoing Uniform Rules and the consequent abandonment of the position taken long ago in Independence Tp. v. Pompton Tp., supra. Therefore, statements made by plaintiff's now-deceased relatives about his place of birth are admissible as tending to prove that he was born in the United States despite the objection offered by the defendants.

Plaintiff testified that after believing for many years that he had been born in New York, he was told in the late 1920s by his sister Felicia that he had been born in San Francisco on December 25, 1888. Felicia died in 1941.

Plaintiff's cousin, Louis Bruno, testified that he was born in Nicosia, Sicily, lived in the same neighborhood as the plaintiff's family and had been his childhood playmate. The children of the neighborhood called the plaintiff the "Americano" and Bruno, curious, asked plaintiff's mother why this was so. She replied that it was because plaintiff was born in America.

Written documents were introduced by the defendants intended to bring home to the plaintiff discrepancies with regard to the place and date of his birth in papers signed by him. They are:

(1) A signature card of the Hoboken Trust Company, dated November 30, 1908, in which his birthplace is given as Italy and his birth date as December 25, 1881. (Defendants' Exhibit 6.)

(2) The records of his first marriage on June 4, 1919 in New York City consisting of the certificate and record of the marriage showing his birthplace as New York City and that he was 31 years old at the time of his marriage (Defendants' Exhibit 1) and the application for marriage license, dated May 13, 1919, which gave his age as 31 years on December 25, 1918 (Defendants' Exhibit 2).

(3) An application for insurance in the Lincoln National Life Insurance Company, dated July 8, 1930, in which his birthplace is given as New York City and his birth date as December 25, 1888 (Defendants' Exhibit 5).

(4) A fingerprint record of Union County, New Jersey, dated October 19, 1933, in which his birthplace is given as San Francisco and his birth date as December 25, 1888 (Defendants' Exhibit 4).

(5) A permanent voting registration record, dated May 21, 1940, showing that plaintiff disclosed himself to be "native born" on December 25, 1888 (Defendants' Exhibit 3).

Of the foregoing five items, 4 and 5 are consistent with the plaintiff's position in this case. It is true that in item 3 his birthplace is given as New York City, but he explains that this application for insurance was made by his wife, who is listed thereon as beneficiary, and that she gave the material to the insurance agent and all that he did in connection with it was to sign it. In item 2 of the year 1919, the age discrepancy of one year "31 years on December 25, 1918" can be understandable error and certainly does not coincide with the defendants' contention that he was born in 1891. His designation of New York City as

his birthplace can be reconciled with his assertion that he then believed that he had been born in New York, and had not learned from his sister, Felicia, until the late 1920s that he was born in San Francisco. On item 1 his only writing is his signature. All other information on it is in another handwriting. Plaintiff testified in relation to it that his cousin suggested to him that inasmuch as he was making good money as a boilermaker he should bank some of it against the future. Plaintiff agreed and signed the card, but the cousin gave the information on it to the person who filled it in at the bank. It is interesting to note that the age given on the card would have made plaintiff about 73 at the time he appeared for the trial of this case. His appearance indicated no such advanced years and his statements in connection with the card seemed consistent and plausible.

None of these documents were impressive in impugning the plaintiff's veracity, but on the other hand seemed reconcilable with his theory of the case. In fact, except for item 1, the signature card, they all tend to corroborate the assertions of the plaintiff that he has always regarded himself as native born. It is especially significant that these statements were made by him at times long before he could have anticipated the necessity for defending himself in deportation proceedings.

Concededly for the purpose of affecting the plaintiff's credibility, he was asked on cross examination if he had ever been an officer of the Tropical Steamship Company or the Zuber Steamship Company. He replied that he did not know whether he had been an officer of either. Defendants then introduced evidence, documentary as well as testimonial, which, taken together, rather conclusively established that plaintiff had once been vice-president of both corporations. Defendants argue that it is inconceivable that plaintiff should not remember holding these offices within the last decade. That may be. But it should be remembered that defendants are, in this in-

stance, setting up a straw man only to knock him down. Defendants have revealed nothing about plaintiff's association with these concerns other than that he was vice-president of them and his reluctance to admit it. It would appear that defendants deliberately picked this topic knowing that plaintiff would be loathe to testify about it. If there were illicit connotations surrounding these enterprises it was not brought out and indeed such evidence would be of doubtful admissibility. What reasons plaintiff had for his reticence are not relevant or appropriate for speculation here. This effort by defendants did not seriously impair the plaintiff's credibility.

The defendants place their main emphasis around their introduction of what was at first described as a birth certificate of Nicolo Amoruso, born at Nicosia, Sicily, on December 23, 1891. Introduction was attempted under 28 U.S.C.A. § 1741:

> "A copy of any foreign document of record or on file in a public office of a foreign country or political subdivision thereof, certified by the lawful custodian thereof, shall be admissible in evidence when authenticated by a certificate of a consular officer of the United States resident in such foreign country, under the seal of his office, that the copy has been certified by the lawful custodian."

The government's original offer under this statute was rejected because of improper authentication. It requested and was granted time in which to cure this defect. The case was continued for a month at which time the government returned with a properly authenticated document, but one that was merely a statement by an Italian official of what was contained in the records under his care and was not a copy as required by the statute.

This exhibit consisted of two sheets tied together by the same ribbon and authenticated together by the same seal and signature. Their translations are

set out below.[2] Nothing is more obvious than that both sheets are and were meant to be one and the same document. One sheet contains a recital that the official found in the records of Nicosia, Sicily, a birth certificate of Nicolo Amoruso born December 23, 1891, the son of Luigi Amoruso and Provvidenza Rizzo Amoruso. These were the names of plaintiff's parents. The second sheet contains a similar recital of the contents of other records relating to the Amoruso family. It shows the marriage of Luigi Amoruso and Provvidenza Rizzo and recites the births and deaths of their children. Besides giving the names and birth dates of three children who died in infancy or childhood, this paper shows that this Amoruso family had two sons named Graziano and Arcangelo. This plaintiff admits having two brothers by those names, one 15 and the other about 10 years older than he. The recitals fit this description and at the bottom of the list is shown the birth on December 23, 1891, of a Nicolo Amoruso. If plaintiff is the Nicolo Amoruso, whose birth is recorded in these documents the defendants have, of course, met their burden of proof.

Plaintiff objected to the defendants' offer of this proof, but later agreed that they could, if given time, get a copy of a document showing the same facts as those recited in the "Birth Certificate" of Nicolo Amoruso and withdrew his objection to the introduction of the "Birth Certificate" on the ground that it was not a copy of an official record as the statute requires. However, plaintiff did this with the reservation that he could attack the weight to be given the alleged

2.

(1st Sheet)

"Municipality of Nicosia
"Province of Enna
"Office of Vital Statistics
"Birth Certificate

"After checking entry no. 574, in Part I of the Birth Records for 1891 the Registrar of Vital Statistics certifies that Nicolo Amoruso son of Luigi Amoruso and Provvidenza Rizzo was born on December 23, 1891 in Nicosia.

"Issued free of the usually required fee by request of the American General Consul in Palermo.

"Nicosia, February 9, 1953

"The clerk
"S/E. Mirabella.

"The Register of Vital Statistics
"Signed: Vincenzo Nisi

"Seal of the office of Vital Statistics
"Municipality of Nicosia"

(2nd Sheet)

"Province of Enna
"*Comune of Nicosia*
"*Office of Vital Statistics*

"File No. 88          February 16, 1953
"Reply to letters dated Jan. 9, 1953 and February 12, 1953 No. 211

Amoruso Nicolas GCP :gc

"Subject: Amoruso Nicolo' son of the late Luigi and of the late Rizzo Provvidenza, born in Nicosia on December 23, 1891.

"Transmittal of Birth Certificate
"To: The American General Consulate United States of America

*Palermo*

"In answer to the above-mentioned letters, I have the honor to transmit the requested Birth Certificate of Nicolo' Amoruso, as described above, on unofficial paper and legalized.

"You are informed that various researches in the files of this office have revealed only the following:

"Amoruso Luigi, son of the late Arcangelo and of the late Lo Papa Agostina, born in Nicosia on April 19, 1845. On January 20, 1872 Entry No. 7, said Amoruso Luigi married in this Comune: Rizzo Provvidenza daughter of Graziano and of Vitale Luigia, born in Nicosia February 7, 1851. From this marriage were born the following children:

* Arcangelo: born on February 3, 1873, deceased Aug. 2, 1881
* Graziano: born on July 1, 1879 (On June 30, 1923 he married Emanuele Teresa Angela. He died in 1939
* Arcangelo: born on January 21, 1882
* Sigismondo: born on Sept. 13, 1887—deceased on August 3, 1888
* Agostina: born on Nov. 13, 1889—deceased on November 24, 1890
*Nicolo': born on December 23, 1891

"Mrs. Provvidenza Rizzo, the mother of the above named, died in this Comune on December 4, 1943. No dates are known concerning the death of Luigi Amoruso, their father, and the date, even approximate, of their departure from Nicosia.

"The Registrar of Vital Statistics
"S/Vincenzo Nisi"

"Birth Certificate". To do this plaintiff utilized the second sheet which recited the births in the Amoruso family. He pointed out that there was a vital omission from this record—it contains no reference to plaintiff's sister, Felicia, whose existence cannot be doubted. The government objected, refused to have this document marked as part of its exhibit, and consequently the second sheet of the record recitals transmitted from Italy became plaintiff's exhibit instead of the defendants'.

The defendants, having introduced one sheet of the document transmitted to them from Italy, cannot validly object to the introduction of the remainder of the document by the plaintiff for the purpose of attacking the weight or relevancy of that portion first introduced. Grobelny v. W. T. Cowan, Inc., 2 Cir., 1945, 151 F.2d 810; Cox v. United States, 7 Cir., 1939, 103 F.2d 133; 7 Wig. § 2113; 31 C.J.S., Evidence, § 190.

Only a factual decision remains to be made. Has the government overcome plaintiff's prima facie case by clear, unequivocal, and convincing evidence? The government's case stands or falls upon the alleged "Birth Certificate". If it is established by clear, unequivocal, and convincing evidence that the Nicolo Amoruso whose birth is recorded therein is Nicholas Delmore, plaintiff in this case, then of course, judgment must be for the government. But the government has not succeeded in making its proof by that exacting standard. Plaintiff's attack upon the weight to be accorded the government's exhibit entitled "Birth Certificate" by showing that the records of Nicosia do not show the birth of a daughter Felicia to the Amoruso family whose geneological history has been exhibited here demonstrates either a crucial inaccuracy casting a shadow on the entire record, or the description of an Amoruso family other than that of the plaintiff. It is such as to leave a lingering doubt that the plaintiff is the same person whose birth is recorded in the introduced documents. This is especially so in view of testimony that the names Amoruso, Luigi, Provvidenza and Rizzo were very common names in Nicosia, at that time a fairly large town of from 15,000 to 20,000 inhabitants.

The Court of Appeals for this circuit, in the recent case of United States v. Anastasio, 3 Cir., 1955, 226 F.2d 912, rehearing en banc denied page 923, enunciated plainly the duties of courts when dealing with cases in which the implication of deportation of persons claiming to be citizens of the United States is present. Although the following language arose from a denaturalization case, the principles upon which it is based are applicable here:

"We are fully aware of the unsavory background of this particular defendant. But the very fact that *extrinsic* considerations may operate to make the government zealous in its prosecution should make the courts equally zealous to see that there be conformance to the letter and spirit of the naturalization laws.

"No criticism is implied of the Justice Department's 'deportation program' with respect to naturalized racketeers, noted in the Supreme Court's recent opinion in Shaughnessy v. United States ex rel. Accardi, 349 U.S. 280, 75 S.Ct. 746, but no matter how worthy the cause or its objective, the courts cannot lose sight of the fact that this is a government by law and not men nor against men.

"The courts must be less concerned with what one undesirable citizen can do if he is permitted to retain his citizenship and residence in this country than with what one bad precedent-making decision can do." United States v. Anastasio, 3 Cir., 1955, 226 F.2d 912, 919.

Hence it is found that the defendants have not met the exacting standard of proof demanded of them in this case.

An order should be settled for judgment in favor of the plaintiff declaring him to be a citizen of the United States.

The foregoing shall constitute findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.