Fred **BALDRIDGE** et al., Plaintiffs-Appellants,

v.

John R. **HADLEY** et al., Defendants-Appellees,

and

United States of America, Intervenor-Appellee, Cross-Appellant.

Nos. 73–1320, 73–1321.

United States Court of Appeals,
Tenth Circuit.

Argued Nov. 13, 1973.

Decided Jan. 9, 1974.

Rehearing Denied January 30, 1974.

Lynell G. Skarda, Clovis, N. M. (Michael T. Garrett, Garrett & Hartley, Clovis, N. M., on the brief), for plaintiffs-appellants.

Michael H. Stein, Atty., Dept. of Justice, Washington, D. C. (Irving Jaffe, Acting Asst. Atty. Gen., Victor Ortega, U. S. Atty., and Robert Kopp, and Walter H. Fleischer, Attys., Dept. of Justice, on the brief), for defendants-appellees, intervenor-appellee.

Before SETH, ALDISERT and DOYLE, Circuit Judges.

DOYLE, Circuit Judge.

This is an action which was commenced by Fred Baldridge, Travis W. Taylor and Herman D. Terry, seeking to set aside the determination of the New Mexico State Agricultural Stabilization and Conservation Committee, which determination had been affirmed by the Secretary of Agriculture, holding that the plaintiffs and others had engaged in a scheme or device designed to evade the limitation placed upon producers who participate in the Conservation Reserve Program under the Soil Bank Act, 7 U. S.C. § 1801 et seq. The Committee ruled that the device was entered into for the purpose of gaining reserve contracts. It was held that these contracts were void in that they were part of a fraudulent scheme to circumvent the limitation of the Act and that as a consequence Baldridge was liable for the monies which had been paid by the government in the belief that the parties involved were bona fide owners. The amount of the judgment was $232,211.10 plus an additional sum against Fred Baldridge in the amount of $31,966.56, pursuant to the False Claims Act, 31 U. S.C. § 231. The appeal here is from a judgment of the district court which generally upheld the administrative actions.

The governing jurisdictional statute is 7 U.S.C. § 1831(d) which authorizes a trial *de novo* in United States District Court of the decision of the Agricultural Stabilization and Conservation Commit-

tee. The United States intervened in the district court asserting claims against the plaintiffs on the independent jurisdictional basis of the False Claims Act, 31 U.S.C. § 231 et seq., and for misrepresentation, 28 U.S.C. § 1345.

The transaction giving rise to these proceedings in question commenced in 1958, at which time Robert Draper was the owner of a 4,300 acre farm in New Mexico. He entered into negotiations with Fred Baldridge and T. E. Baldridge, son and father, for the sale of this farm. For the purpose of the transaction the farm was divided into seven tracts of 640 acres each. Six of these were transferred to Fred Baldridge, Travis W. Taylor, Sam L. Henderson, Thomas Fred Adams, Henry E. Baldridge, Jr. and Herman D. Terry. Robert Draper retained the seventh tract. An agreement was entered into under the terms of which each of the grantees would with his particular tract become a participant in the Conservation Reserve Program. Each of the grantees executed a promissory note to Draper secured by a mortgage on the parcel deeded. The note provided in essence that the payee agreed to look solely to the property described in the mortgage and that no deficiency would be entered against the maker of the note. Each of the grantees executed a warranty deed on the property to Fred Baldridge. These deeds were delivered to the Citizens Bank of Clovis, New Mexico, to be held in escrow pursuant to contracts of sale from the five relatives and Draper to Fred Baldridge. The contracts expressed the consideration as being Fred Baldridge's performance of all work necessary under the Conservation Reserve Program for the ten-year period commencing in 1959, that is, the cultivation and seeding required by the Department of Agriculture. A further provision was that the sellers were to pay to Baldridge all sums received by them from the Department of Agriculture in connection with work performed on the land, and finally provided that after completion of the ten-year Soil Bank contracts the deeds were to be delivered to Baldridge.

The original grantor, Robert Draper, entered into the same kind of an arrangement, that is, he executed a note in favor of Fred Baldridge for $47,464.77 and was also a party to the contract. The purchasers, including Draper, applied for participation in the Conservation Reserve Program. The County A. S.C. Committee the first year denied the applications, but granted them the next year.

Significantly, all of the participants in this were relatives of Baldridge with the exception of Robert Draper, the grantor. A regulation, 22 Fed.Reg. 9641, provides that eligibility hinges on the understanding that the property for which application is made would, in the absence of the granting of the award, be farmed by the new owner. Very soon after the approval of the tracts of land for participation in the program, the participants, as noted, signed contracts of sale for their respective sections to Fred Baldridge.

The trial court's further findings, supported by the record, are as follows:

Fred Baldridge performed under the contracts and brought all the tracts into compliance with Conservation Reserve Program requirements. A temporary cover crop of maize and *hygeria* was planted in 1959. The crop was allowed to fall in the field for the purpose of protecting the permanent cover crop to be planted the following year. Several miles of fence were constructed to complete enclosure of the farms. In 1960 Fred Baldridge planted a permanent cover of African Weeping Lovegrass. From 1960 to 1968 all that was required of Fred Baldridge to keep the farms in compliance was to replant several small areas in Weeping Lovegrass, control noxious weeds and repair fences when necessary to keep stock out of the fields.

In return for Fred Baldridge's work, annual payments were made un-

862

der the Conservation Reserve Program in the following totals:

| | |
|---|---|
| Travis Taylor | $33,906.60 |
| Sam Henderson | 34,894.30 |
| Thomas F. Adams | 28,931.40 |
| Henry E. Baldridge | 26,371.20 |
| Herman Terry | 39,655.70 |
| Fred Baldridge | 28,551.00 |
| Robert Draper | 39,900.90 |

Payments on the land to or for Robert Draper were made by the participants in the following totals:

| | |
|---|---|
| Travis W. Taylor | $22,162.14 |
| Sam Henderson | 19,445.40 |
| Thomas Adams | 18,686.46 |
| Henry E. Baldridge, Jr. | 17,174.43 |
| Herman O. Terry | 25,855.83 |
| Fred Baldridge | 32,016.23 |

Robert Draper, T. E. Baldridge and Fred Baldridge, without disclosing their intention to the other parties involved, agreed among themselves in 1958 that the entire farm would be sold for around $160,000.00. They then computed the payments to be made by the buyers to total about $210,000.00. The excess $50,000.00 was to be rebated to Fred Baldridge over the ten year period at the rate of $3,352.11 for the first six years and $8,000.00 per year thereafter. This accounts for the $47,464.77 note Robert Draper executed in favor of Fred Baldridge on March 3, 1958, and under which he made payment of $3,352.11 in 1959.

The applicable regulations in force in 1959 provided in pertinent part:

"The total of all annual payments under the conservation reserve program to pay any producer for any year with respect to all farms in which he has an interest shall not exceed $5,000.00. . . . All or any part of the annual payment which otherwise would be due any producer may be withheld, or required to be refunded, if he has adopted or participated in adopting any scheme or device . . . or by any other means designed to evade, or which has the effect of evading the provisions of this section." 21 Fed.Reg. 6296, 8793 (1956).

"In the event the Secretary determines that there has been a violation of any contract during the time the producer has control of the farm, and that such violation is of such a substantial nature as to warrant termination of the contract, all rights to annual and cost share payments and grants under the contract shall be forfeited and all such payments and grants received by the producer shall be refunded with interest at the rate of 6% per annum." 21 Fed.Reg. 6297 (1956).

In 1965 one of the relatives (Henderson) decided to drop out of the program and he refused to make his annual payment to Draper. However, the payment was made by Fred Baldridge's mother and Baldridge immediately withdrew from escrow Henderson's deed and the deed to the land of Draper, who obtained a Conservation Reserve contract on it. About this same time the contract on Draper's farm, that is the one that he had retained, expired. As to the farm that Draper had retained, that is A–109, Baldridge had the legal right to take possession of it. Notwithstanding this, however, Draper executed another deed in favor of Baldridge and Baldridge entered into an option agreement to purchase this farm and to lease it. He then applied to receive payments under the Crop Land Adjustment Program, 7 U.S.C. § 1838. On the assumption that he was a lessee, the government paid him $14,983.28.

The trial court found that the ultimate object of the program was to have the government pay the full purchase price of the farm. The court further found as evidencing the scheme that Baldridge withdrew all of the remaining warranty deeds from the relatives in March 1969, notwithstanding that under their terms they were not to be delivered until December 1969. The district

court, in addition, made the following findings of fact:

1. That Baldridge received kickbacks on rebates from Draper in the form of payments on Draper's $47,464.77 promissory note.

2. That in 1959 Baldridge received $3,684.00 directly from his Conservation Reserve Program contract annual payment, and in the same year he received an additional $3,352.11 in the form of a rebate from Robert Draper. The court was of the opinion that this of itself constituted a violation of the contract between Baldridge and the Conservation Reserve Program.

3. That the relatives realized little after payment of income tax on the amounts received.

4. That the relatives acted as agents for Fred Baldridge, who was found to have been the instigator of the plan, the purpose of which was to evade the maximum payment limitation causing the government to pay for a seven tract farm rather than a single tract.

The trial court refused, however, to allow recovery of double damages under the False Claims Act. The reason for this was that they had processed the case through the administrative procedure and obtained a full recovery from Baldridge of amounts paid to him and all of the other participants so that it would not be just to allow the government to elect to proceed under the False Claims Act after having previously elected to proceed administratively. The government has cross-appealed on this issue.

In addition to the government's point just mentioned raised on cross-appeal, the issues revolve around these points posed by appellants:

1. The contention of appellants that the deeds were inoperative because they were in escrow, leaving Baldridge without the requisite interest.

2. The alleged insufficiency of the evidence to establish a scheme and whether the elements of actionable fraud are present.

3. The alleged insufficiency of the evidence to support the trial court's finding of a violation of the Cropland Adjustment Program, and its assessment of double damages and forfeiture thereunder.

I.

## LEGALITY AND EFFECT OF THE DEEDS

Appellant Baldridge first argues that under New Mexico law a deed placed in escrow is effective as of the date of final delivery. He relies on the decision of the New Mexico Supreme Court in Mosley v. Magnolia Petroleum Co., 45 N.M. 230, 114 P.2d 740 (1941). Here two deeds were given, one of them conveying a one-half interest in minerals and the other one-fourth. They were deposited in a bank in escrow awaiting payment of the purchase price in the amount of $800.00. The grantee obtained the deed conveying the one-half interest and did so unlawfully. He sold it to a third person for $800.00, first altering it. He then took the $800.00 back to the bank and received the deed to the undivided one-fourth. Subsequently, the previous owner sought to quiet title. The Supreme Court of New Mexico concluded that the deed originally given was void because it had not been delivered, because it had been fraudulently obtained from the escrow holder without complying with the agreement and, furthermore, had been illegally altered, and so the title of Mosley, the original owner, was recognized. This case is easily distinguishable. There the deed was illegally obtained from escrow and was invalidly altered. Assuming then that the law of New Mexico applies, the effect of this decision would not be that Baldridge would have no interest in the land. In truth he had all of the interest. Indeed, it was shown that he had ready access to the deeds should he need them. The relatives were thinly veiled agents who had renounced all interest in the property.

■ We are of the opinion that the trial court was eminently correct in ig-

noring the forms which were erected and recognizing the true facts. Counsel for Baldridge argues that this was all legal and therefore non-fraudulent. We disagree. The arrangement has the evidences of a devious sham which was designed to deceive. Its elaborate legal structure, while giving it the look of legality, does not bear scrutiny.

In sum, we need not here be concerned with the issue posed by appellants, namely, the effectiveness of the deeds. Our inquiry concerns the transaction in its entirety and whether it was a deceptive effort.

## II.

### THE CONTENTION THAT THE DEFENDANTS' CONDUCT WAS NOT FRAUDULENT

Defendants argue that Baldridge was not the sole or even the principal actor in this effort, whereby he can be held liable for all of the Conservation Reserve payments received by the transferees. As we have indicated above, the evidence shows that the participants-relatives were, so to speak, strawmen. They merely participated as agents of Baldridge by going through the formalities. They executed warranty deeds to Baldridge for a nominal consideration and Baldridge acted as owner of the farm throughout the period of the payments. His mother made the payment on behalf of Henderson when the latter defaulted and withdrew, and subsequently he treated the Henderson parcel as if it were his own. He also paid the real estate taxes on Draper's parcel.

The trial court relied on all of these factors in its holding that Fred Baldridge was the principal in developing a plan, scheme or device to evade the maximum payment limitation by dividing the farms and obtaining several payments rather than one. The trial court correctly found that the entire transaction was conducted by Baldridge for his own benefit. The only tenable conclusion is that there was a fraud and that Baldridge perpetrated it.[1] The fact that it was not in the form of traditional false representations does not detract from the conclusion.[2]

The applicable federal regulation, 7 C.F.R. § 750.164, provides for a maximum payment limitation of $5,000.00 to any producer for any year with respect to all farms in which he has an interest. The regulation further provides that it is a violation of the contract if the producer has adopted or participated in adopting a scheme or device, the effect of which is to evade or exceed the maximum payment limitation. *See* 7 C.F.R. § 750.294(i). Money received contrary to the maximum payment limitation is forfeited under 22 Fed.Reg. 4781 (1957) and 25 Fed.Reg. 1868 (1960), so both the letter and spirit of the regulations cover the problem at bar.

As previously noted, Baldridge was the principal actor and qualified as a producer pursuant to 7 C.F.R. § 750.-150(q). Moreover, the other relatives, including Travis Taylor and Herman Terry, do not meet the definition contained in the mentioned regulation and thus the court was correct in exonerating them.

---

1. Generally, "fraud" consists of some deceitful practice or wilful device resorted to for the purpose of inducing another, in reliance upon it, to surrender money, property, or legal rights, and it connotes perjury, falsification, concealment and misrepresentation. *See* Knauer v. United States, 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500 (1946) ; J. F. White Engineering Corp. v. General Ins. Co. of Amer., 351 F.2d 231 (10th Cir. 1965) ; Nichoalds v. McGlothlin, 330 F.2d 454 (10th Cir. 1964) ; 37 C.J.S. Fraud § 1.

2. *See* S.E.C. v. Capital Gains Research Bureau, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) where the Supreme Court concluded that statutory "fraud or deceit" need not be interpreted technically so as to require the traditional misstatement and intent to injure, which are necessary elements of common law fraud. Rather Congressional enactments and administrative regulations should be interpreted broadly and liberally in order to effectuate their essential purposes.

## III.

## CONTENTION THAT APPELLANTS DID NOT VIOLATE CROPLAND ADJUSTMENT PROGRAM

█ Baldridge seeks to reverse the district court's additional $31,966.56 judgment against him under the False Claims Act for fraudulent violation of the Cropland Adjustment Program (C. A.P.) under the Food and Agricultural Act of 1965, see 7 U.S.C. § 1838 and the applicable regulations, 7 C.F.R. § 751.-101 et seq.[3] The evidence discloses that Fred Baldridge received C.A.P. payments by representing to the government that 1) he was a cash lessee of the farm and 2) the farm had not changed hands during the preceding three years. Baldridge supported these representations by recording a ten-year farm lease agreement entered into with Robert Draper. In actuality, however, Fred Baldridge was the owner of the land in question, a valid deed to the property having been delivered to him on January 1, 1966. Baldridge, therefore, created the artificial lessee relationship for the purpose of the claim.

The Baldridge argument is again a legalistic one, that the delivery of the deed was not effective to pass title in the absence of intention by both the grantor and grantee, who now claim that the deed was held by Baldridge solely for security. Both the argument and the lease are transparent and unconvincing. The evidence established that Robert Draper had deeded the property to Baldridge in 1958. The deed was delivered in 1966, but was not recorded. The trial court found that the subsequently recorded farm lease was wholly fictitious and presented solely for the purpose of causing the United States to pay to Baldridge money to which he knew he was not entitled. The court's finding was supported by the facts presented. Like his efforts to receive Conservation Reserve payments, Baldridge's actions in this endeavor were also designed to procure government payments which were not rightfully his.[4] True, this transaction is less circular and complex than the others, but it is no less deceptive in nature.

We see no basis for disturbing the trial court's ruling.

## IV.

## THE QUESTION WHETHER THE GOVERNMENT IS ENTITLED TO DOUBLE DAMAGES UNDER THE FALSE CLAIMS ACT

In the counterclaim of the government which was filed in the action which Baldridge brought seeking to set aside the A.S.C. award, the government sought double or penalty damages under the False Claims Act, 31 U.S.C. § 231 et seq. which provides for the payment of the penalty sum of $2,000.00 and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing of such act. The trial court denied the government's claim under the False Claims Statute on the basis that it was inconsistent and unjust to allow the government to proceed under the Soil Bank Act initially and then subsequently to file another and different claim under the False Claims Act.[5]

---

3. This claim was not presented in the administrative proceeding but was raised by the government for the first time at the trial de novo in district court. Thus, the government is not seeking to exploit an area in which it has already had a recovery as in Part II above.

4. Compare Fleming v. United States, 336 F. 2d 475 (10th Cir. 1964).

5. The trial court said:
　　. . .　The government has introduced evidence which is clearly and convincingly persuasive that recovery could be allowed against Fred Baldridge under a common law fraud theory. The evidence which supports the committee's conclusion is equally convincing that Fred Baldridge knowingly perpetrated a fraud upon the government. However, a recovery under a common law fraud theory would be no greater than the recovery already allowed by sustaining the committee action. Thus the necessity for further discussion of a common law fraud recovery is obviated. It should be noted that if the administra-

■ We agree with the trial court's conclusion on this. The principle which comes to mind is that of the incompatibility of the remedies of rescission and damages. It does not tolerate vacillating from one remedy to another.[6]

At bar the government's action in pursuing the administrative remedy is in the nature of a rescission of the contracts which it had with the several persons involved and a claim for restitution of the money paid out in the mistaken belief that the demands were bona fide and valid. The essential nature and character of the false claims demand is, on the other hand, an action in damages seeking recovery of the penalties provided by statute. We disagree with the government's argument that these remedies are supplemental to any other remedies provided by law. There are no decisions which deal with the identical issue presented in our case either from this Circuit or elsewhere. We are persuaded, nevertheless, that the trial court's reasoning is valid. Both claims arise from the identical set of facts, and in these circumstances at least it is unfair to allow the government to compound its measure of damages by proceeding under a supplemental remedy.

There had been an adjudication on the one theory at the administrative level

prior to the filing of the action in court, and so the test of res judicata suggested by Professor Moore is also present.

Accordingly, it is our view that the trial court ruled correctly on this and, therefore, the government's cross-appeal must be denied.

The judgment of the district court is affirmed.

tive procedure had been inadequate or unavailable to sustain the full recovery of $232,211.10 against Fred Baldridge, the government would be entitled under the evidence in this cause to a judgment in that amount against him for common law fraud.

Recovery will not be allowed against Fred Baldridge under the False Claims Act. Having proceeded through the administrative process and obtained a full recovery from Baldridge of all amounts paid to him and the other participants, it would not now be just to allow the government to elect to proceed under the False Claims Act and recover the double damages provided thereunder.

6. This doctrine is discussed in 1B J. Moore, Federal Practice Section 0.405, at 764–65 (2d ed. 1953) as follows:

. . . An election of the substantive right to affirm extinguishes the substantive right to disaffirm. And so an at-

tempt to invoke the remedy of rescission after an action on the contract may fail, not because of election of inconsistent remedies, but because the plaintiff no longer has the substantive right to disaffirm.

The result in other cases decided upon the basis of election of remedies can often be justified today upon general principles of res judicata. In those jurisdictions where a litigant can present all the bases for a claim, whether legal or equitable, inconsistent, alternative or hypothetical, in a single action, failure to invoke all "inconsistent remedies" in an initial suit which goes to final judgment on the merits should preclude their assertion in subsequent litigation between the parties and their privies—not because of election of remedies, but because a final judgment on the merits is res judicata as to all matters pertaining to a single cause of action which might have been litigated.